Filed 11/12/15; second of two modifications—first modification and unmodified opinion attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| FRANCES STEVENS,<br><br>　　　Petitioner,<br><br>　v.<br><br>WORKERS' COMPENSATION APPEALS BOARD and OUTSPOKEN ENTERPRISES/STATE COMPENSATION INSURANCE FUND et al.,<br><br>　　　Respondents. | A143043<br><br>(WCAB No. ADJ1526353)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT] |

BY THE COURT

　　　The opinion filed October 28, 2015, is modified by deleting the second sentence in the eleventh paragraph under FACTUAL AND PROCEDURAL BACKGROUND and replacing it with "A different entity, Maximus Federal Services, is used to perform IMRs."

　　　The modification does not change the appellate judgment.  (Cal Rules of Court, rule 8.264(c)(2).)

　　　Petitioner's petition for rehearing is denied.


　　　　　　　　　　　　　　　　　　　_____P.J.


1

| | |
|---|---|
| Trial Court: | No County Applies |
| Trial Judge: | None |
| Counsel for Petitioner: | Law Offices of Joseph C. Waxman, Joseph C. Waxman, James J. Achermann |
| Counsel for Amicus Curiae California Applicants' Attorneys Association on behalf of Petitioner: | The Law Office of Joseph V. Capurro, Joseph V. Capurro; Remcho, Johansen & Purcell, LLP, James C. Harrison, Margaret R. Prinzing, Harry Berezin |
| Counsel for Amicus Curiae Voters Injured at Work on behalf of Petitioner: | Law Office of Charles E. Clark, Charles E. Clark; The Rondeau Law Firm, Charles R. Rondeau |
| Counsel for Respondent Workers' Compensation Appeals Board: | No appearance |
| Counsel for Respondents Outspoken Enterprises and State Compensation Insurance Fund, Sacramento: | State Compensation Insurance Fund, Lisa A. Liebson, Deputy Chief Counsel, Mary R. Huckabaa, Assistant Chief Counsel, William L. Anderson, Appellate Counsel |
| Counsel for Respondent Acting Administrative Director Division of Workers' Compensation: | Department of Industrial Relations, Office of the Director, Legal Unit, Christopher G. Jagard, Chief Counsel, Kim E. Card, Counsel; Department of Industrial Relations Division of Workers' Compensation, George Parisotto, Acting Chief Counsel, Yvonne M. Hauscarriague, Counsel, Alan S. Hersh, Counsel |

| | |
|---|---|
| Counsel for Amicus Curiae California Chamber of Congress on behalf of Respondents: | Haight Brown & Bonesteel LLP, Theodore A. Penny, Melinda Carrido |
| Counsel for Amicus Curiae Sonoma County Law Enforcement Association on behalf of Respondents: | Mastagni Holstedt, David P. Mastagni, Gary G. Gomez |
| Counsel for Amicus Curiae California Workers' Compensation Institute & Property and Casualty Insurers Association of America on behalf of Respondents: | Law Offices of Allweiss & McMurtry, Michael A. Marks |

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| FRANCES STEVENS,<br><br>     Petitioner,<br><br>  v.<br><br>WORKERS' COMPENSATION APPEALS BOARD, OUTSPOKEN ENTERPRISES et al.,<br><br>     Respondents. | A143043<br><br>(WCAB No. ADJ1526353)<br><br>ORDER MODIFYING OPINION<br>[NO CHANGE IN JUDGMENT] |

BY THE COURT

The opinion in the above-entitled matter, filed October 28, 2015, is modified to delete the content of footnote 7, replacing it with the following:

> We grant Stevens's request to take judicial notice of the Chronic Pain Medical Treatment Guidelines (effective July 18, 2009), posted at www.dir.ca.gov/dwc/DWCPropRegs/MTUS_ChronicPainMedicalTreatment Guidelines.pdf (as of October 28, 2015).

> This change does not necessitate the renumbering of the footnotes.

This modification does not change the appellate judgment. (Cal. Rules of Court, rule 8.264(c)(2).)

Dated: _____ _____P.J.

1

| | |
|---|---|
| Trial Court: | No County Applies |
| Trial Judge: | None |
| Counsel for Petitioner: | Law Offices of Joseph C. Waxman, Joseph C. Waxman, James J. Achermann |
| Counsel for Amicus Curiae California Applicants' Attorneys Association on behalf of Petitioner: | The Law Office of Joseph V. Capurro, Joseph V. Capurro; Remcho, Johansen & Purcell, LLP, James C. Harrison, Margaret R. Prinzing, Harry Berezin |
| Counsel for Amicus Curiae Voters Injured at Work on behalf of Petitioner: | Law Office of Charles E. Clark, Charles E. Clark; The Rondeau Law Firm, Charles R. Rondeau |
| Counsel for Respondent Workers' Compensation Appeals Board: | No appearance |
| Counsel for Respondents Outspoken Enterprises and State Compensation Insurance Fund, Sacramento: | State Compensation Insurance Fund, Lisa A. Liebson, Deputy Chief Counsel, Mary R. Huckabaa, Assistant Chief Counsel, William L. Anderson, Appellate Counsel |
| Counsel for Respondent Acting Administrative Director Division of Workers' Compensation: | Department of Industrial Relations, Office of the Director, Legal Unit, Christopher G. Jagard, Chief Counsel, Kim E. Card, Counsel; Department of Industrial Relations Division of Workers' Compensation, George Parisotto, Acting Chief Counsel, Yvonne M. Hauscarriague, Counsel, Alan S. Hersh, Counsel |

| | |
|---|---|
| Counsel for Amicus Curiae California Chamber of Congress on behalf of Respondents: | Haight Brown & Bonesteel LLP, Theodore A. Penny, Melinda Carrido |
| Counsel for Amicus Curiae Sonoma County Law Enforcement Association on behalf of Respondents: | Mastagni Holstedt, David P. Mastagni, Gary G. Gomez |
| Counsel for Amicus Curiae California Workers' Compensation Institute & Property and Casualty Insurers Association of America on behalf of Respondents: | Law Offices of Allweiss & McMurtry, Michael A. Marks |

Filed 10/28/15 Unmodified opinion

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| FRANCES STEVENS,<br><br>    Petitioner,<br><br>  v.<br><br>WORKERS' COMPENSATION<br>APPEALS BOARD, OUTSPOKEN<br>ENTERPRISES et al.,<br><br>    Respondents. | A143043<br><br>(WCAB No. ADJ1526353) |

## INTRODUCTION

The workers' compensation system has undergone major reforms in recent years. Legislation that went into effect in 2004 made the system more efficient and less costly by having injured workers' requests for medical treatment evaluated through a process called utilization review (UR).[1]  Under the UR process, a request for treatment cannot be denied by a claims adjustor and must be approved unless a clinician determines that the treatment is medically unnecessary.  And under the UR process, workers can challenge decisions denying requested treatment, but employers cannot challenge decisions approving it.  The 2004 legislation also called for the administrative adoption of a schedule establishing uniform standards for physicians to use in evaluating treatment

---

[1] The 2004 legislation relevant to the issues in this case was set forth in two statutes.  The first, Senate Bill No. 228 (2003-2004 Reg. Sess.) (Stats. 2003, ch. 639, § 28, p. 4923) became effective on January 1, 2004.  The second, Senate Bill No. 899 (2003-2004 Reg. Sess.) (Stats. 2004, ch. 34) became effective on April 19, 2004.

requests.[2]  In 2013, additional reforms went into effect that built off the 2004 legislation and established a new procedure, independent medical review (IMR), to resolve workers' challenges to UR decisions.[3]

In this writ proceeding, Frances Stevens challenges the constitutionality of the IMR process.  She contends that it violates the state Constitution's separation of powers clause, the state Constitution's requirements that workers' compensation decisions be subject to review and the system "accomplish substantial justice," and principles of due process.  We are not persuaded.  We conclude that her state constitutional challenges fail because the Legislature has plenary powers over the workers' compensation system under article XIV, section 4 of the state Constitution (Section 4).  And we conclude that her federal due process challenge fails because California's scheme for evaluating workers' treatment requests is fundamentally fair and affords workers sufficient opportunities to present evidence and be heard.

But we also conclude that the Workers' Compensation Appeals Board (the Board) misunderstood its statutory authority in one respect when it reviewed Stevens's appeal.  The Board concluded that it was unable to review the portion of the IMR determination that found, "Medical treatment does not include . . . personal care given by home health aides . . . when this is the only care needed."  Under the 2013 reforms, however, the Board is empowered to review an IMR decision to consider whether care was denied without authority because the care is authorized under the MTUS.  (§ 4610.6, subd. (h)(1) & (5).)  We therefore remand this matter to the Board to consider whether Stevens's request for a home health aide was denied without authority.

---

[2] This schedule, the Medical Treatment Utilization Schedule (MTUS), was adopted in 2007 and has since been updated.  (Cal. Code Regs., tit. 8, §§ 9792.20-9792.26.)

[3] This legislation was set forth in Senate Bill No. 863 (2011-2012 Reg. Sess.), which went into effect on January 1, 2013.  It added sections 4610.5 and 4610.6 to the Labor Code.  (Stats. 2012, ch. 363, §§ 45-46, pp. 3764-3768.)  Further undesignated statutory references are to the Labor Code.

# FACTUAL AND
## PROCEDURAL BACKGROUND

Stevens fractured her right foot in October 1997 while working as a magazine editor for Outspoken Enterprises. Between 1999 and 2002, she underwent three surgeries on the foot. In 1999, she began to have pain in her left foot, marking the onset of a condition that was ultimately diagnosed as complex-regional-pain syndrome involving both feet. Stevens worked intermittently until 2002, but she was unable to return to work after the third surgery. As a result of the pain in her feet, she was forced to use a wheelchair and that, in turn, caused low-back and bilateral-shoulder pain. Eventually, she became severely depressed. Following a trial in May 2013, a workers' compensation judge determined that she was permanently totally disabled.

Stevens's employer was insured by the State Compensation Insurance Fund (the SCIF), which has accepted responsibility for her related medical care since the original injury. Over the years, Stevens has received extensive medical care that the SCIF has covered. In this proceeding, no one disputes the general proposition that Stevens suffers from pain and other ailments and is entitled to receive SCIF-covered medical care.

Instead, this case is about a particular request for treatment submitted to the SCIF in July 2013 by Stevens's physician, Babak Jamasbi, M.D. Dr. Jamasbi sought approval for Stevens to receive four medications—Ativan, Flexeril, diolofenac cream, and hydrocodone—mainly to alleviate her pain. He also sought approval for Stevens to receive the services of a home health aide for eight hours a day, five days a week. The aide was to help Stevens with bathing and dressing, moving about her home, preparing meals, and picking up medications from the pharmacy.

Dr. Jamasbi's request was processed under the SCIF's established UR procedures and was forwarded to the SCIF's UR agent, Bunch CareSolutions. The request was then reviewed by Andrew G. Seltzer, M.D., a board-certified anesthesiologist who holds a subspecialty certification in pain management. Dr. Seltzer certified that he had no "material personal, professional, or financial conflict of interest with the patient, health care providers, insurer/payer, referring entity, or the recommended treatment." He also

3

certified that his compensation was not "dependent in any way on the specific outcome of the case." In reviewing Dr. Jamasbi's request, Dr. Seltzer considered a July 19, 2013 medical report by Dr. Jamasbi and "15 pages of additional medical records."[4]

Dr. Seltzer denied the request and provided an extensive, nine-page rationale for his decision. First, he maintained that a home health aide was not warranted because the documentation did not demonstrate that Stevens was homebound ("normally unable to leave home unassisted") or that she required home medical care, much less full-time care, and because most of the aide's proposed tasks were not medical in nature. Second, he denied the request for Ativan because the drug's efficacy for long-term chronic pain "is unproven and there is a risk of dependence," noting that "[m]ost guidelines limit use to 4 weeks." Third, he denied the request for Flexeril because there was no evidence that Stevens has acute muscle spasms, the drug should be used only as a "second-line option" for "short-term" treatment, and the drug has limited and diminishing benefits beyond those that can be obtained through nonsteroidal anti-inflammatory drugs (NSAIDs). Fourth, he denied the request for diolofenac cream because studies suggest that its benefits, if any, are short-term and quickly diminish, it is most effective for conditions Stevens did not have, and it could expose a patient to significant risks, including cardiovascular dangers. And finally, he denied the request for hydrocodone because the drug is an opioid and should be used, if at all, after NSAIDs have been tried, and then only as a supplement to, not a substitute for, NSAIDs in "the lowest possible dose" and with a plan in place to closely monitor its proper use—especially with patients, like Stevens, who suffer from depression or have other mental-health issues.

A letter notifying Stevens of Dr. Seltzer's decision informed her that she had "a right to disagree with decisions affecting [her] claim," and she was invited to call Bunch CareSolutions if she had questions. She was also informed that she, her physician, or her attorney could ask for an internal review of the decision, which would be performed by a different "Physician Advisor."

---

[4] The record does not further reveal the content of these additional documents.

4

Stevens requested the internal review, at least regarding the denial of the request for the four medications.[5] This review was conducted by Claudio A. Palma, M.D., another board-certified anesthesiologist who has a subspecialty certification in pain management. As did Dr. Seltzer, Dr. Palma certified that he had no "material personal, professional, or financial conflict of interest with the patient, health care providers, insurer/payer, referring entity, or the recommended treatment." And as did Dr. Seltzer, he certified that his compensation was not "dependent in any way on the specific outcome of the case."

Stevens was given, and she exercised, the opportunity to submit additional evidence for the internal review. This evidence included a seven-page report by Dr. Jamasbi dated August 14, 2013, addressing Dr. Seltzer's decision. In deciding the internal appeal, Dr. Palma considered Dr. Jamasbi's August 2013 report along with "10 pages of additional medical records."[6]

Dr. Palma agreed with Dr. Seltzer that the request for the four medications should be denied, and he provided a nine-page explanation of his decision. Regarding the Ativan, he found that "there remains no (clear) documentation of the intention to treat over a short course." Regarding the Flexeril, he found that "there remains no (clear) documentation of (acute) muscle spasms." Regarding the diolofenac cream, he found that "there remains no documentation of subjective and objective findings consistent with osteoarthritis pain in joints that lend themselves to topical treatment . . . and the intention to treat over a short course." And regarding the hydrocodone, he found that "there remains no documentation that the prescriptions are from a single[]practitioner and are taken as directed; the lowest possible dose is being prescribed; and there will be ongoing review and documentation of pain relief, functional status, appropriate medication use, and side effects." Dr. Palma further noted that "[s]hould the missing criteria necessary to support the medical necessity of this request [for hydrocodone] remain unavailable,

---

[5] Our record does not show that Stevens sought an internal review of the decision denying her request for a home health aide.

[6] Our record does not further identify the content of these documents either.

5

discontinuance should include a tapering prior to discontinuing to avoid withdrawal symptoms."

Stevens was notified that the internal review confirmed the UR decision. The notice to her stated, "If you have questions about the information in this notice, please call us. However, if you are represented by an attorney, please contact your attorney instead." Similarly, she was told that "if [she had] any questions regarding this determination or if [her] physician would like to speak to the Physician Reviewer," she should contact Bunch CareSolutions.

Dissatisfied with the UR and internal-review decisions, Stevens then requested an IMR. The SCIF uses a different entity, Maximus Federal Services, to perform IMRs. Stevens was again given the opportunity, which she exercised, to submit further documentation to support her treatment request. Although our record does not contain all the material she submitted, the material apparently included a supplemental report by Dr. Jamasbi, the order finding Stevens to be permanently disabled, numerous physical-therapy reports, four reports authored by the parties' agreed-upon medical examiner in the liability stage of the proceeding, an April 2013 home assessment by an organization called Rehab Without Walls, and 17 reports by Dr. Jamasbi dated from August 2012 through October 2013.

The final IMR determination was issued in February 2014, and it upheld the UR denial of the requested medical treatment. The determination did not identify the IMR physician reviewer but reported that the reviewer was "Board Certified in Pain Management, ha[d] a subspecialty in Disability Evaluation[, was] licensed to practice medicine in California[,] . . . ha[d] been in active clinical practice for more than five years[,] and [was] currently working at least 24 hours a week in active practice." The determination also noted that this physician had "no affiliation with the employer, employee, providers[,] or . . . claims administrator."

The IMR determination concluded that "none of the disputed items/services are medically necessary and appropriate." Regarding the home health aide, the determination relied on the MTUS, which includes guidelines for the treatment of chronic

6

pain.[7] The determination stated that the guidelines recommend home health aides for patients who are "homebound, on a part-time or 'intermittent' basis, generally up to no more than 35 hours per week. Medical treatment does not include homemaker services like shopping, cleaning, and laundry, and personal care given by home health aides like bathing, dressing, and using the bathroom when this is the only care needed."

The IMR determination also relied on the MTUS in concluding that none of the four requested medications was medically necessary. It explained that Ativan (a benzodiazepine) is not recommended "for long-term use because long-term efficacy is unproven and there is a risk of dependence. Most guidelines limit use to 4 weeks. Their range of action includes sedative/hypnotic, anxiolytic, anticonvulsant, and muscle relaxant. Chronic benzodiazepines are the treatment of choice in very few conditions. Tolerance to hypnotic effects develops rapidly. Tolerance to anxiolytic effects occurs within months and long-term use may actually increase anxiety." The determination then explained that Flexeril is recommended for only "a short course of therapy," with a recommended low dosage over no more than two to three weeks, and the greatest benefit is seen in "the first 4 days of therapy." The determination denied the request for Flexeril because Stevens "continue[d] to be symptomatic with pain." The determination next explained that diolofenac cream was not medically necessary because "there is little evidence [supporting the use of] topical NSAIDs for treatment of osteoarthritis of the spine, hip or shoulder. Neuropathic pain: Not recommended as there is no evidence to support use." Finally, the determination explained that hydrocodone was medically unnecessary because, while opioids are "indicated for moderate to moderately severe pain[] and are often used for intermittent or breakthrough pain," they "are [not] seen as an effective method in controlling chronic pain."[8] The IMR determination became the

---

[7] We grant Stevens's request to take judicial notice of the Chronic Pain Medical Treatment Guidelines (effective July 18, 2009), posted at A143343 (as of October 28, 2015).

[8] In an apparent typographical error, the comment in the determination omitted the word "not." The comment makes sense only if that word is included.

7

determination of the Director of the Division of Workers' Compensation (director) as a matter of law.  (§§ 3206, 4610.6, subd. (g).)

Stevens appealed the IMR determination—now deemed the director's decision—to the Board under section 4610.6, subdivision (h).  Among other arguments, she claimed that section 4610.6 violates Section 4 and her rights to due process.  The appeal was heard by a workers' compensation judge, who concluded that the appeal was not cognizable because it was not brought on grounds permitted by section 4610.6, subdivision (h).  In particular, the judge held that the IMR determination did not "constitute a plainly erroneous express or implied finding of fact on a matter of ordinary knowledge not subject to expert opinion" or reflect an act in excess of the director's powers.  The judge also concluded that the Board had no jurisdiction to consider the constitutionality of section 4610.6.

Stevens petitioned for reconsideration under section 5900, but the Board accepted a recommendation of the workers' compensation judge to deny the petition.  In doing so, the Board agreed with the judge that it "ha[d] no authority to determine the constitutionality of the IMR statutes as sought by applicant."  It ruled that "for purposes of appeal to the [Board,] it does not matter whether the reasons given for an IMR determination support the determination unless the appealing party proves one or more of five grounds for appeal listed by the Legislature in section 4610[, subdivision (h)] by clear and convincing evidence," and that Stevens had not done so.

Stevens filed a petition for a writ of review in this court under section 5950.  After briefing was completed,[9] we issued a writ of review to address the constitutional challenges she raises.

---

[9] We granted leave to California Workers' Compensation Institute and Property Casualty Insurers Association of America, California Chamber of Commerce, California Applicants' Attorneys Association, Voters Injured at Work, and Sonoma County Law Enforcement Association to file amici curiae briefs.

DISCUSSION

Stevens contends that the IMR process violates the state Constitution's separation of powers clause, the state Constitution's requirements that workers' compensation decisions be subject to review and the system "accomplish substantial justice," and principles of due process.[10]  For the reasons we shall discuss, we reject these arguments.

A.      *The 2004 and 2013 Legislation Significantly Reformed the Process for Considering Injured Workers' Requests for Medical Treatment.*

We begin with an overview of how the legislative reforms have changed the process for considering injured workers' requests for medical treatment.  We do so because Stevens's near-exclusive focus on the IMR process minimizes other critical procedural protections and rights that come into play when an injured worker requests medical treatment under the workers' compensation system.

The state Constitution gives the Legislature "plenary power . . . to create[] and enforce a complete system of workers' compensation."  (§ 4.)  Acting under this power, the Legislature enacted the workers' compensation law to govern compensation to California workers who are injured in the course of their employment.  (§ 3201 et seq.)  "The underlying premise behind this statutorily created system . . . is the ' "compensation bargain[,]" ' . . . [under which] 'the employer assumes liability for industrial personal injury or death without regard to fault in exchange for limitations on the amount of that liability.  The employee is afforded relatively swift and certain payment of benefits to cure or relieve the effects of industrial injury without having to prove fault but, in exchange, gives up the wider range of damages potentially available in tort.' " (*Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 811.) The right to workers' compensation benefits is entirely statutory.  (*DuBois v. Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 388.)

---

[10] We invited and received supplemental briefing on whether the state Constitution's separation of powers and due process clauses are limited by Section 4, which gives the Legislature plenary power over the workers' compensation system.

9

The workers' compensation law requires employers to secure the payment of workers' compensation benefits either by purchasing third-party insurance or by self-insuring with permission from the Department of Industrial Relations. (§ 3700; see also *Denny's Inc. v. Workers' Comp. Appeals Bd.* (2003) 104 Cal.App.4th 1433, 1439.) Many employers, such as Stevens's, obtain their third-party insurance from the SCIF.[11]

Before 2004, an employer's obligation to cover an injured worker's medical treatment was largely in the hands of the worker's treating physician. "[T]here were no uniform medical treatment guidelines in place" to instruct the treating physician, and there was a rebuttable presumption that the physician's determinations were correct. (*State Comp. Ins. Fund v. Workers' Comp. Appeals Bd.* (*Sandhagen*) (2008) 44 Cal.4th 230, 238.) Back then, if an employer wanted to challenge a treating physician's recommendation, its only recourse was through a "cumbersome, lengthy, and potentially costly" dispute resolution process. (*Ibid.*) Generally, this process required the parties either to stipulate to an agreed-upon medical evaluator or to propose alternative medical evaluators and, if a dispute remained after the evaluations were completed, to litigate their dispute before a workers' compensation judge. (*Id.* at pp. 238-239.) Under the former process, both the worker and the employer could challenge adverse medical-necessity determinations, and the criteria by which those determinations were evaluated depended on the quantity and quality of the expert evidence presented by the parties. A party dissatisfied with the workers' compensation judge's decision could then appeal it to the Board, which could assess the evidence and make factual determinations different from those made by the judge. (*Scheffield Medical Group, Inc. v. Workers' Comp. Appeals Bd.* (1999) 70 Cal.App.4th 868, 880.)

---

[11] At least as of 1999, the SCIF "was the state's largest workers' compensation carrier[,] . . . [had] issued policies to more than 250,000 California employers, and ha[d] held itself out to the public as the most experienced carrier in California." (*Notrica v. State Comp. Ins. Fund* (1999) 70 Cal.App.4th 911, 918.) It is a unique, quasi-governmental entity designed by the Legislature to "be fairly competitive with other insurers" and to be "neither more nor less than self-supporting." (Ins. Code, § 11775; see also *California Attorneys, etc. v. Brown* (2011) 195 Cal.App.4th 119, 124.)

In 2004, two pieces of legislation, Senate Bills No. 228 and No. 899, went into effect to streamline the process and control costs. (*Sandhagen*, *supra*, 44 Cal.4th at pp. 239, 241.) The legislation made two changes important to the issues before us. First, it required every employer to establish a UR process that "prospectively, retrospectively, or concurrently reviews and approves, modifies, delays, or denies medical treatment services." (*Sierra Pacific Industries v. Workers' Comp. Appeals Bd.* (2006) 140 Cal.App.4th 1498, 1512.) Under this UR process, workers' requests for treatment may be *approved* by a claims administrator, but only a reviewer "competent to evaluate the specific clinical issues involved . . . [that are] within the scope of the individual's practice"—not, as before, a claims administrator or employer—may "modify, delay, or deny a request for authorization." (Cal. Code Regs., tit. 8, § 9792.9.1(e)(1); see also *Sandhagen*, at p. 240.)

Second, the 2004 legislation required "the . . . director to adopt a medical treatment utilization schedule to establish uniform guidelines for evaluating treatment requests. [Citation.] The [law required] this schedule to incorporate 'evidence-based, peer-reviewed, nationally recognized standards of care' and address the 'appropriateness of all treatment procedures . . . commonly performed in workers' compensation cases.' " (*Sandhagen*, *supra*, 44 Cal.4th at p. 240.) The legislation mandated that UR determinations be consistent with the schedule, and it created "a rebuttable presumption that the treatment guidelines in the utilization schedule were correct on the issue of extent and scope of medical treatment."[12] (*Ibid.*) The 2004 reforms were intended "to ensure quality, standardized medical care for workers in a prompt and expeditious manner" through a "comprehensive process that balances the dual interests of speed and accuracy, emphasizing the quick resolution of treatment requests, . . . [in which] a physician, rather than a claims adjuster with no medical training, makes the decision to deny, delay, or modify treatment." (*Id.* at p. 241.)

---

[12] As mentioned previously, the MTUS was adopted in June 2007. (Cal. Code Regs., tit. 8, §§ 9792.20-9792.26.)

Against this backdrop, the Legislature enacted further reforms that went into effect in 2013 establishing the IMR process to resolve workers' challenges to adverse UR decisions. (Stats. 2012, ch. 363.) In enacting this legislation, the Legislature made extensive findings, which bear repeating. It found that the then-existing system of resolving disputes about treatment requests was "costly, time consuming, and [did] not uniformly result in the provision of treatment that adhere[d] to the highest standards of evidence-based medicine, [and this] adversely affect[ed] the health and safety of workers injured in the course of employment." (*Id.*, § 1(d), p. 3719.) It further found that "[t]he existing process of appointing qualified medical evaluators to examine patients and resolve treatment disputes [was] costly and time-consuming, and it prolong[ed] disputes and cause[d] delays in medical treatment for injured workers." (*Id.*, § 1(f), p. 3720.) It also found that "the process of selection of qualified medical evaluators [could] bias the outcomes" and that the "independent and unbiased medical expertise of specialists" was necessary for the "[t]imely and medically sound determinations of disputes over appropriate medical treatment." (*Ibid.*) According to the Legislature, "having medical professionals ultimately determine the necessity of requested treatment furthers the social policy of this state in reference to using evidence-based medicine to provide injured workers with the highest quality of medical care," and "the provision . . . establishing independent medical review [is] necessary to implement that policy." (*Id.*, §1(e), p. 3719.) Finally, it found that establishing "independent medical review and [providing] for limited appeal of decisions . . . [was] a necessary exercise of the Legislature's plenary power" under Section 4. (*Id.*, § 1(g), p. 3720.)

Since the 2004 and 2013 reforms, a worker's physician now submits a treatment recommendation that is reviewed under the employer's UR process. (§ 4610.) A "medical director" designated by the employer or insurer reviews all information "reasonably necessary" to determine whether to approve, modify, or deny the recommendation. (§ 4610, subd. (d).) The criteria used in making the determination must be "consistent with the schedule for medical treatment utilization." (§ 4610, subd. (f)(2).)

12

A UR decision favoring the worker becomes final, and the employer is not permitted to challenge it.  (See § 4610.5, subd. (f)(1).)  But if the UR decision modifies, delays, or denies a request, the worker may seek review through an IMR.[13]  (§ 4610.5, subd. (d).)  In other words, the IMR process gives workers, but not employers, a second chance to obtain a decision in their favor.

The IMR is performed by an independent review organization, which assigns medical professionals to review pertinent medical records, provider reports, and other information submitted to the organization or requested from the parties.  (§ 4610.6, subd. (b).)  The physician reviewer is to approve the requested treatment if it is "medically necessary based on the specific medical needs of the employee and the standards of medical necessity as defined in subsection (c) of Section 4610.5."  (§ 4610.6, subd. (c).)  The IMR determination must state whether the disputed service is medically necessary, identify the employee's medical condition and the relevant medical records, and set forth the relevant findings associated with the standards of medical necessity. (§ 4610.6, subd. (e).)  These standards include, in the order listed in the statute:  (1) the MTUS; (2) peer-reviewed scientific and medical evidence regarding the effectiveness of the disputed treatment; (3) nationally recognized professional standards; (4) expert opinion; and (5) generally accepted standards of medical practice.  (§ 4610.5, subd. (c)(2).)  If multiple medical professionals review a case, a majority must agree on the final decision, and if they are evenly split, the decision must favor the worker. (§ 4610.6, subd. (e).)  Decisions must include the reviewing medical professionals' qualifications, but the independent review organization is to "keep the names of the reviewers confidential in all [outside] communications."  (§ 4610.6, subd. (f).)  The IMR

---

[13] "A [UR] decision to modify, delay, or deny a treatment recommendation shall remain effective for 12 months from the date of the decision without further action by the employer with regard to any further recommendation by the same physician for the same treatment unless the further recommendation is supported by a documented change in the facts material to the basis of the [UR] decision."  (§ 4610, subd. (g)(6).)  We do not know whether Stevens ever resubmitted a request for authorization of the treatment sought.

13

determination is deemed as a matter of law to constitute the determination of the director and is binding on all parties. (§ 4610.6, subd. (g).)

A worker who disputes the IMR determination may appeal it to the Board. (§ 4610.6, subd. (h).) Such an appeal proceeds under the standard claim-presentation procedures set forth under section 5500 et sequitur, except that the only specified grounds for relief since the reforms are that the director acted without authority, the decision was procured by fraud, the physician reviewer had a material conflict of interest, the decision was the result of bias, or the decision was based on a plainly erroneous fact that is not a matter subject to expert opinion. (§ 4610.6, subd. (h).) If the Board reverses the decision, it cannot now, as it could before, reweigh the evidence and make a contrary factual determination as to the medical necessity of the requested treatment. (§ 4610.6, subd. (i); see *Scheffield Medical Group, Inc. v. Workers' Comp. Appeals Bd.*, *supra*, 70 Cal.App.4th at p. 880.) Instead, it may only remand the case for a new IMR. (§ 4610.6, subd. (i).)

Finally, a Board decision can still be challenged by filing a writ of review in the Court of Appeal. (§ 5950.) Although appellate courts are now explicitly precluded from making "a determination of medical necessity contrary to the determination of the independent medical review[er]" (§ 4610.6, subd. (i)), this change has little practical effect since they never had the authority to make factual determinations in the first place. (See *Western Growers Ins. Co. v. Workers' Comp. Appeals Bd*. (1993) 16 Cal.App.4th 227, 233.)

Both workers and employers benefitted from the 2004 and 2013 reforms. For workers, the reforms ensured that treatment requests would no longer be modified, delayed, or denied except by a physician. "This represent[ed] a significant departure from the [former] process . . ., which permitted an employer or claims adjuster (without review by a physician) to object to a treatment request." (*Sandhagen, supra,* 44 Cal.4th at p. 240.) Workers also secured a guarantee that UR decisions rendered in their favor could not be challenged by employers on medical-necessity grounds. (Cal. Code Regs., tit. 8, § 9792.10.1.) This ensured faster final resolution of these decisions, and it

14

constituted a meaningful curtailment of employers' rights. For employers, the reforms promised to reduce insurance costs by creating uniform medical standards and reducing litigation.

With this understanding of the 2004 and 2013 reforms, we turn to Stevens's constitutional contentions.

B.     *The Plenary Powers Over the Workers' Compensation System Conferred*
        *on the Legislature by Section 4 Are Not Limited by the State Constitution's*
        *Separation of Powers or Due Process Clauses.*

Stevens contends that the IMR process violates the state Constitution's separation of powers and due process clauses. We reject this claim because Section 4 supersedes these clauses even if we were to suppose that they somehow conflict with Section 4.

The separation of powers clause states, "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." (Cal. Const., art. III, § 3.) The due process clause states, "A person may not be deprived of life, liberty, or property without due process of law." (*Id*., art. I, § 7(a).)

In interpreting constitutional provisions, our goal is to ascertain the intent behind them. (*Greene v. Marin County Flood Control & Water Conservation Dist.* (2010) 49 Cal.4th 277, 290.) We look first to the provision's text, giving the words their ordinary meaning. (*Ibid.*) When the language is unambiguous, we need go no further. (*Ibid.*) But if the language permits more than one reasonable interpretation, we may consider other indicators of intent, such as legislative history. (*Bautista v. State of California* (2011) 201 Cal.App.4th 716, 724 (*Bautista*)*; Quarterman v. Kefauver* (1997) 55 Cal.App.4th 1366, 1371.) In evaluating the constitutionality of the IMR process, we apply the standard presumption that properly enacted statutes are constitutional and that any doubts are resolved in favor of their validity. (*Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1302; *Lockyer v. City and County of San Francisco* (2004) 33 Cal.4th 1055, 1086.)

Stevens's separation-of-powers claim fails under the state Constitution's plain terms. Under Section 4, the Legislature "is [] expressly vested with plenary power,

15

*unlimited by any provision of this Constitution,* to create, and enforce a complete system of workers' compensation, by appropriate legislation." (§ 4, italics added.) Simultaneously, the separation of powers clause expressly yields to other constitutional provisions, including Section 4, by preventing one branch of government from exercising the powers of another "*except as permitted by this Constitution.*" (*Id.*, art. III, § 3, italics added.) Thus, there is no question that Section 4 trumps the separation of powers clause under the state Constitution's plain terms.

Section 4 also trumps the state Constitution's due process clause. Our state Supreme Court has made clear that constitutional amendments can be "understood as carving out an exception to the preexisting scope of the . . . due process clause[] with respect to the subject matter encompassed by the new provision."[14] (*Strauss v. Horton* (2009) 46 Cal.4th 364, 407.) By giving the Legislature plenary powers over the workers' compensation system, Section 4 modified the reach of the state Constitution's due process clause.

Section 4's evolution was described in *Bautista, supra*, 201 Cal.App.4th 716. The section's predecessor, section 21 of article XX, was approved by the voters in 1911. (*Bautista*, at p. 731.) Two years later, the Legislature changed the workers' compensation system from voluntary to mandatory by statute. (*Ibid.*) In 1917, the Legislature recommended to the voters a constitutional amendment to " 'remove all doubts as to the constitutionality of then[-]existing [workers'] compensation laws.' " (*Id.* at pp. 731-732.) The amendment passed, and it "further clarified and expanded the scope of the Legislature's constitutional authority to enact . . . legislation as part of a complete system of workers' compensation." (*Id.* at p. 732; *Mathews v. Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 719, 733, fn. 11.) This evolution compels the conclusion

---

[14] The original due process clause, which is substantively identical to the current one, was part of the Constitution when it was ratified in 1850. (Cal. Const., art. I, § 8, 1850 Stats. p. 25 ["No person shall be . . . deprived of life, liberty, or property, without due process of law"].) As a result of a reorganization of article I by the voters' passage of Proposition 7 in 1974, the clause is now set forth in section 7. (See Historical Notes, 1 West's Ann. Const. Code (2002 ed.) foll. art. 1, § 7, p. 252.)

16

that Section 4 supersedes the state Constitution's due process clause with respect to legislation passed under the Legislature's plenary powers over the workers' compensation system. (See *Hustedt v. Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 329, 343 ["It is well established that the adoption of [Section 4] 'effected a repeal *pro tanto*' of any state constitutional provisions which conflicted with that amendment"]; see also *Greener v. Workers' Comp. Appeals Bd.* (1993) 6 Cal.4th 1028, 1037 [article VI of the state Constitution governing courts' jurisdiction inapplicable to extent Legislature has exercised its powers under Section 4].) Thus, even if there were any conflicts between Section 4 and the state Constitution's separation of powers or due process clauses—a conclusion we do not and need not reach—the plenary powers conferred by Section 4 would still control.

## C.     *The IMR Process Does Not Violate Section 4.*

We next consider Stevens's argument that the IMR process violates Section 4's own requirements that tribunal decisions be subject to review by appellate courts and that the workers' compensation system provide "substantial justice in all cases." Again, we are not persuaded.

The first of these two requirements states, "The Legislature is vested with plenary powers, to provide for the settlement of any disputes . . . by arbitration, or . . . by the courts, or by either, any, or all of these agencies, either separately or in combination, and may fix and control the method and manner of trial of any such dispute, the rules of evidence and the manner of review of decisions rendered by the tribunal or tribunals designated by it; provided, that all decisions of any such tribunal shall be subject to review by the appellate courts of this State." (§ 4.) The second requirement states, "A complete system of workers' compensation includes . . . full provision for vesting power, authority and jurisdiction in an administrative body with all the requisite governmental functions to determine any dispute or matter arising under such legislation, to the end that the administration of such legislation shall accomplish substantial justice in all cases expeditiously, inexpensively, and without incumbrance of any character." (*Ibid.*)

17

We observe at the outset that the notion that Section 4 itself imposes separate restraints on the plenary powers it confers on the Legislature has been decidedly rejected. "[A]bsolutely nothing" in Section 4 "purports to limit the Legislature's authority to enact additional appropriate legislation for the protection of employees." (*City and County of San Francisco v. Workers' Comp. Appeals Bd.* (*Wiebe*) (1978) 22 Cal.3d 103, 114.) Instead, Section 4 "affirms the legislative prerogative in the workers' compensation realm in broad and sweeping language" and confers on the Legislature "the power to 'fix and control the method and manner of trial of any . . . dispute[s over compensation for injury] [and] the rules of evidence [applicable to] the tribunal or tribunals designated by it.' " (*Wiebe,* at p. 115.)

The Legislature's broad power over workers' compensation matters has been repeatedly affirmed. (See, e.g., *Bautista, supra,* 201 Cal.App.4th at p. 725 ["The grant of 'plenary power[]' gives the Legislature complete, absolute, and unqualified power to create and enact the workers' compensation system"]; *Facundo-Guerrero v. Workers' Comp. Appeals Bd.* (2008) 163 Cal.App.4th 640, 650 [intent behind Section 4 "was . . . to endow [the Legislature] expressly with exclusive and 'plenary' authority to determine the contours and content of our state's workers' compensation system"].) These cases confirm that nearly *any* exercise of the Legislature's plenary powers over workers' compensation is permissible so long as the Legislature finds its action to be "necessary to the effectiveness of the system of workers' compensation." (*Greener v. Workers' Comp. Appeals Bd., supra,* 6 Cal.4th at p. 1038, fn. 8.) Indeed, the only limitations on the Legislature's plenary powers, neither of which applies here, are that the Legislature cannot act *outside* of its authority to create and to enforce a complete system of workers' compensation (see *Hustedt v. Workers' Comp. Appeals Bd., supra*, 30 Cal.3d at p. 343), or, as we discuss below in section II.D., enact a provision that conflicts with federal law. We have found no authority permitting us to invalidate a statute on the basis of Section 4 itself when the Legislature has made a finding of necessity in enacting the statute, as it did here. (See, e.g., *Wiebe, supra*, 22 Cal.3d at pp. 110-112; *Bautista,* at p. 726

18

[declining to adopt employee's argument that isolated provisions of Section 4 supersede Legislature's plenary powers].)

Even if Section 4 itself *did* impose separate limits on the Legislature's plenary powers, we would reject Stevens's specific contentions that the IMR process violates those limits. First, the IMR process does not violate Section 4's requirement "that all decisions of any such tribunal shall be subject to review by the appellate courts of this State." (§ 4.) Since the establishment of the IMR process, an aggrieved worker who contests a Board decision affirming a medical necessity determination can, as he or she could before, challenge a Board decision by seeking a writ of review from the Court of Appeal. (§ 5950.) But as we mentioned above, although appellate courts are now statutorily precluded from making "a determination of medical necessity contrary to the determination of the [IMR] organization" (§ 4610.6, subd. (i)), they never had the authority to make such a determination in the first place. (*Western Growers Ins. Co. v. Workers' Comp. Appeals Bd.*, *supra*, 16 Cal.App.4th at p. 233.) Instead, the reforms limited appellate review only indirectly, to the extent they limited the *Board's* ability to review IMR determinations. Whereas previously the Court of Appeal could "determine whether the evidence, when viewed in light of the entire record, support[ed] the award of the [Board]" (*ibid.*), such substantial-evidence review is no longer available because the Board is precluded from making its own factual findings. This has a slight practical impact, however, because under the current system, the record for a worker's challenge in the Court of Appeal necessarily includes, as a result of the UR and IMR, at least two physicians' conclusions that the requested treatment is unnecessary. Under the old system, the conclusions of at least two physicians would have virtually always constituted substantial evidence to uphold an adverse medical-necessity determination. And nothing in the legislative reforms constrains a Court of Appeal's consideration of any other issue.

We are similarly unconvinced by Stevens's argument that section 4610.6 conflicts with Section 4's mandate that the workers' compensation system provide "substantial justice in all cases expeditiously, inexpensively, and without encumbrance of any

19

character." (§ 4.) In establishing the IMR process, the Legislature found that the former system of resolving disputes over the medical necessity of requested treatment impeded justice because it was "costly and time-consuming, and it prolong[ed] disputes and cause[d] delays in medical treatment for injured workers." (Stats. 2012, ch. 363, § 1(f), p. 3720.) It found that "independent and unbiased medical expertise of specialists" is necessary for "[t]imely and medically sound determinations of disputes over appropriate medical treatment." (*Ibid*.) Similarly, it found that "having medical professionals ultimately determine the necessity of requested treatment furthers the social policy of this state in reference to using evidence-based medicine to provide injured workers with the highest quality of medical care and that the provision[s] of the act establishing independent medical review are necessary to implement that policy." (*Id.*, § 1(e), p. 3719.) Finally, it found that "the establishment of independent medical review and provision for limited appeal of decisions resulting from independent medical review are a necessary exercise of the Legislature's plenary power to provide for the settlement of any disputes arising under the workers' compensation laws of this state and to control the manner of review of such decisions." (*Id.*, § 1(g), p. 3720.) In sum, the Legislature found that, far from conflicting with Section 4's mandate to provide substantial justice, the IMR process *furthers* it. It is not our place under the state Constitution to "second-guess the wisdom of the Legislature" in making these determinations. (*Facundo-Guerrero v. Workers' Comp. Appeals Bd., supra*, 163 Cal.App.4th at p. 651; *Rio Linda Union School Dist. v. Workers' Comp. Appeals Bd.* (2005) 131 Cal.App.4th 517, 532.)

In short, there is no basis to conclude that in establishing the IMR process the Legislature acted outside of its plenary powers to enact "appropriate legislation" governing workers' compensation. (§ 4.)

D. *The IMR Process Does Not Violate the Federal Due Process Clause.*

Having concluded that the IMR process does not violate the state Constitution, we consider whether it violates principles of due process under the federal Constitution. We conclude it does not.

20

To prevail on a federal due process claim, plaintiffs must show that the state deprived them of a property or liberty interest without affording sufficient notice and opportunity to be heard.[15] (*American Manufacturers Mutual Ins. Co. v. Sullivan* (1999) 526 U.S. 40, 59 (*American Manufacturers*).) In considering the issues under the federal due process clause, we shall assume, without deciding, both that an IMR determination constitutes state action and that a claim for medical treatment implicates a constitutionally protected property interest. (See *California Consumer Health Care Council, Inc. v. California Department of Managed Health Care* (2008) 161 Cal.App.4th 684, 691 (*California Consumer*) [making similar assumption].)

We take a moment to explain our assumption, however, in light of the United States Supreme Court's holdings in *American Manufacturers*, *supra*, 526 U.S. 40. There, the Court considered a utilization review decision rendered under the Pennsylvania workers' compensation system that denied payment for medical treatment while the claim was being considered. (*Id.* at pp. 45-47.) The Court held that the denial neither constituted state action nor implicated a protected property interest. (*Id.* at pp. 58, 61.) As for state action, the Court found that the insurance entity lacked a " 'sufficiently close nexus' " with the state. (*Id.* at p. 52.) We are willing to assume that the IMR determination here constitutes state action because it, unlike the utilization review decision in *American Manufacturers*, becomes the decision of the director—a state official—as a matter of law. (§ 4610.6, subd. (g).)

*American Manufacturers* also held that the Pennsylvania utilization review decision did not implicate a "property interest in the medical benefits" since such an interest would arise only if the treatment requested was shown to be reasonable and necessary. (*American Manufacturers*, *supra*, 526 U.S. at pp. 60-61.) But the utilization review decision in *American Manufacturers*, unlike the IMR determination here, only

---

[15] The initial analytical framework would be slightly different if state law principles applied, because a person "need not be entitled to a benefit provided by the government to have an interest protected under [the California] due process clause." (*Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 855; see also *People v. Ramirez* (1979) 25 Cal.3d 260, 264-265.)

addressed whether payments were required while a claim for medical treatment was under consideration. "If the employees [in *American Manufacturers*] had claimed that the statute provided inadequate procedures for establishing such a right [to the benefit itself], the [high] court's analysis might have been very different." (*Giaimo v. City of New Haven* (2001) 257 Conn. 481, 503-509 [concluding that Connecticut applicants for workers' compensation benefits possess a protected property interest].) Thus, we assume that the IMR determination here implicated a protected property interest because it resolved the substantive merits of Stevens's treatment request.[16]

Even assuming that the IMR determination constituted state action and implicated a protected property interest, however, we nonetheless conclude that Stevens's federal due process claim fails because Stevens was afforded ample process. "The core of due process is the right to notice and a meaningful opportunity to be heard." (*LaChance v. Erickson* (1998) 522 U.S. 262, 266; *see also Cleveland Bd. of Educ. v. Loudermill* (1985) 470 U.S. 532, 547.) When due process must be afforded, the amount of process required is determined by balancing the affected private interest, the risk of erroneous deprivation of this interest, the probable value, if any, of additional or substitute safeguards, and the government's interest in the process. (*Mathews v. Eldridge* (1976) 424 U.S. 319, 334-335.) In employing this analysis, we reiterate that workers seeking treatment under California's scheme receive far more process, including through UR, than just that which is provided in the IMR procedure.

Our consideration of this issue is guided by *California Consumer*, *supra*, 161 Cal.App.4th 684. There, the Court of Appeal considered a federal due process challenge to denials of medical claims submitted under the Knox-Keene Health Care Service Plan Act of 1975, Health and Safety Code section 1340 et sequitur (Knox-Keene Act). (*California Consumer*, at pp. 687-688, 690.) Under the Knox-Keene Act, requests for

---

[16] In making our assumption, we also recognize that the United States Supreme Court has never squarely resolved whether *applicants* for statutory benefits, as opposed to those already receiving them, have protected property interests. (See *Lyng v. Payne* (1986) 476 U.S. 926, 942; *Walters v. National Assn. of Radiation Survivors* (1985) 473 U.S. 305, 320, fn. 8.)

22

medical care are reviewed under an IMR process codified in Health and Safety Code section 1374.30. (*California Consumer*, at p. 687.) In filing a claim, patients are allowed to submit their own and their medical provider's records. The insurer is also allowed to submit material. But, while insurers are allowed to see and rebut claimants' filings, claimants are not allowed to see and rebut insurers' filings. (*Id.* at p. 692.)

Notwithstanding this disparity, the Court of Appeal held that the IMR process under the Knox-Keene Act comports with due process. It acknowledged the patients' interest in "receiving contracted-for medical care," but it found the risk of an erroneous deprivation to be low since both sides "submit documentation regarding the claim, and the statute allows sufficient time for adequate consideration." (*California Consumer*, *supra*, 161 Cal.App.4th at p. 692.) At the same time, the court found the governmental interests to be strong. It concluded that forcing disclosure of all documents the insurer submits to the independent review organization would be "cumbersome" and "would slow down the process and create a substantial [governmental] burden . . . with little resulting benefit in most cases." (*Id*. at p. 693.)

Here, workers have an interest in obtaining medical services similar to that of the patients in *California Consumer*, *supra*, 161 Cal.App.4th 684. And as a result of the multiple layers of review, the risks of erroneous deprivations under the workers' compensation system appear to be fewer, and certainly no more, than the risks under the Knox-Keene Act procedures. Finally, the government's interest in the IMR process is at least as compelling as the interest in not being forced to disclose insurance documents, and the former interest was expressly and comprehensively identified by the Legislature itself when it established that process. Consistent with *California Consumer*, we cannot conclude after considering these factors that California's process for reviewing workers' medical requests violates "[t]he core of due process" by failing to provide notice and a meaningful opportunity to be heard. (*LaChance v. Erickson, supra,* 522 U.S. at p. 266.)

We are similarly unconvinced by Stevens's insistence that the IMR process violates due process because the physician reviewer is anonymous and not subject to cross-examination. The reviewers are not workers' adversaries: they are statutorily

23

authorized decision makers. We have found no authority for the proposition that a party has a right to cross-examine such decision makers. In *Jennings v. Jones* (1985) 165 Cal.App.3d 1083, the Court of Appeal concluded that welfare recipients had a due process right to cross-examine caseworkers, who were authorized to discontinue benefits on "[their] own concept of 'good cause,' " at a subsequent hearing. (*Id*. at p. 1090.) Unlike a physician reviewer, however, these caseworkers were not reviewing a decision but were instead making the initial decision. Welfare recipients would lack a meaningful opportunity to challenge the basis of the caseworkers' decisions without having an opportunity to discover what that basis was. In contrast, injured workers requesting treatment under the workers' compensation system are given detailed explanations of the reasons for a denial or modification of their request, and they are given multiple opportunities to submit evidence and challenge those decisions. "Procedural due process is not a static concept, but a flexible one to be applied to the needs of the particular situations."[17] (*Ibid*.) The IMR is only one aspect of the process afforded to workers who request treatment, and we conclude that the process in its entirety provides sufficient due process protections.[18]

Stevens also argues that, regardless of the opportunities to be heard, section 4610.6 violates due process because it "limits and precludes any meaningful appeal of an

[17] For example, even if Stevens were seeking to cross-examine *witnesses*, she would not necessarily be entitled to do so. (See *Stardust Mobile Estates, LLC v. City of San Buenaventura* (2007) 147 Cal.App.4th 1170, 1189 [need for cross-examination less "critical" in "cases involving documentary evidence" than in "cases that turn upon the testimony of live witnesses"].)

[18] In a related argument, Stevens claims that the confidentiality of the physician reviewer's identity renders meaningless the ability of workers to challenge an IMR decision on the basis of "a material conflict of interest" as allowed by section 4610.6, subdivision (h)(3). We agree that the confidentiality of the reviewer's identity makes such challenges more difficult, but as pointed out by counsel for Outspoken Enterprises and the SCIF at oral argument, workers have the opportunity to obtain significant other information bearing on conflicts of interest, including information about the IMR organization's "method of selecting expert reviewers and matching [them] to specific cases," system of identifying and recruiting expert reviewers, and method of "ensur[ing] compliance with the [statutory] conflict-of-interest requirements." (§ 139.5, subds. (d)(2)(F)-(H), (e).)

24

IMR determination" and provides "no means to address conflicts about what constitutes medical treatment." (Boldface and initial capitalization omitted.) Again, we disagree.

To begin with, it is far from clear that the federal due process clause necessarily requires *any* review of governmental decisions. (See, e.g., *Pennzoil Co. v. Texaco, Inc.* (1987) 481 U.S. 1, 31, fn. 4 (conc. opn. of Stevens, J.) [disclaiming constitutional right to civil appeals]; *Griffin v. Illinois* (1956) 351 U.S. 12, 18 ["It is true that a State is not required by the Federal Constitution to provide appellate courts or a right to appellate review at all"]; *Reetz v. Michigan* (1903) 188 U.S. 505, 508 ["Neither is the right of appeal essential to due process of law"].) In any event, the IMR process is *itself* a review. It is a review of the UR determination, which, in turn, includes yet another separate internal review.

But even more to the point, and contrary to Stevens's contention, IMR determinations *are* subject to meaningful further review even though the Board is unable to change medical-necessity determinations. The Board's authority to review an IMR determination includes the authority to determine whether it was adopted without authority or based on a plainly erroneous fact that is not a matter of expert opinion. (§ 4610.6, subd. (h)(1) & (5).) These grounds are considerable and include reviews of both factual and legal questions. If, for example, an IMR determination were to deny certain medical treatment because the treatment was not suitable for a person weighing less than 140 pounds, but the information submitted for review showed the applicant weighed 180 pounds, the Board could set aside the determination as based on a plainly erroneous fact. Similarly, the denial of a particular treatment request on the basis that the treatment is not permitted by the MTUS would be reviewable on the ground that the treatment actually *is* permitted by the MTUS. An IMR determination denying treatment on this basis would have been adopted without authority and would thus be reviewable.

Here, the Board failed to appreciate this latter point. In its final order, it ruled that it was powerless to review the IMR determination categorically denying Stevens the services of a home health aide, even though it concluded that Stevens's "condition requires 'care' other than homemaker's services" and considered puzzling the

25

determination's statement that "[m]edical treatment does not include . . . personal care given by home health aides like bathing, dressing, and using the bathroom when this is the only care needed." But whether home health services are authorized when bathing, dressing, and using the bathroom is the only care needed is a question to be resolved by reviewing and interpreting the MTUS. If the Board were to conclude that the IMR determination incorrectly affirmed the denial of these services by wrongly interpreting the MTUS, and it were to find there are no other reasons supporting the denial, it would have the power to conclude that the determination was adopted without authority. (§ 4610.6, subd. (h).)[19] We therefore disagree with Stevens that the IMR process provides "no means to address conflicts about what constitutes medical treatment" and no "meaningful appeal to challenge an IMR decision based on an erroneous interpretation of the law."

Lastly, we reject Stevens's argument that the IMR process violates due process because there are "no meaningful enforcement procedures of the statutory time limits" for IMR decisions. (Boldface and initial capitalization omitted.) In its final decision, the Board noted that Stevens's IMR determination took over seven months and found fault with the lack of a statutory mechanism to enforce section 4610.6, subdivision (d)'s requirement that IMR determinations be made within 30 days. We are unconvinced that the lack of a mechanism to enforce time limits renders the IMR process unconstitutional. In the absence of a penalty, consequence, or contrary intent, a time limit is typically considered to be directory, and its violation does not require the invalidation of the action to which the time limit applies. (See, e.g., *California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1145.) Furthermore, without deciding whether a writ of mandate may have been available to enforce the time limit (see *id.* at p.

---

[19] Stevens's petition seeks relief based on only constitutional claims, and we lack a complete record of what was considered by the independent medical reviewer. Thus, we do not decide whether Stevens might have been entitled to relief on the basis that the IMR determination was adopted without authority or based on a plainly erroneous fact. (§ 4610.6, subd. (h).)

1148), we note that Stevens did not attempt to seek one or otherwise to insist on timely compliance.

## DISPOSITION

The decision of the Board after reconsideration is affirmed, except we remand to the Board for a determination whether the director acted in excess of authority in deciding that personal care given by home health aides was not medically necessary for Stevens. The parties are to bear their own costs. (See Cal. Rules of Court, rule 8.493(a)(1)(B).)


_____
Humes, P.J.


We concur:


_____
Margulies, J.


_____
Dondero, J.

27

| | |
|---|---|
| Trial Court: | No County Applies |
| Trial Judge: | None |
| Counsel for Petitioner: | Law Offices of Joseph C. Waxman, Joseph C. Waxman, James J. Achermann |
| Counsel for Amicus Curiae California Applicants' Attorneys Association on behalf of Petitioner: | The Law Office of Joseph V. Capurro, Joseph V. Capurro; Remcho, Johansen & Purcell, LLP, James C. Harrison, Margaret R. Prinzing, Harry Berezin |
| Counsel for Amicus Curiae Voters Injured at Work on behalf of Petitioner: | Law Office of Charles E. Clark, Charles E. Clark; The Rondeau Law Firm, Charles R. Rondeau |
| Counsel for Respondent Workers' Compensation Appeals Board: | No appearance |
| Counsel for Respondents Outspoken Enterprises and State Compensation Insurance Fund, Sacramento: | State Compensation Insurance Fund, Lisa A. Liebson, Deputy Chief Counsel, Mary R. Huckabaa, Assistant Chief Counsel, William L. Anderson, Appellate Counsel |
| Counsel for Respondent Acting Administrative Director Division of Workers' Compensation: | Department of Industrial Relations, Office of the Director, Legal Unit, Christopher G. Jagard, Chief Counsel, Kim E. Card, Counsel; Department of Industrial Relations Division of Workers' Compensation, George Parisotto, Acting Chief Counsel, Yvonne M. Hauscarriague, Counsel, Alan S. Hersh, Counsel |

| | |
|---|---|
| Counsel for Amicus Curiae California Chamber of Congress on behalf of Respondents: | Haight Brown & Bonesteel LLP, Theodore A. Penny, Melinda Carrido |
| Counsel for Amicus Curiae Sonoma County Law Enforcement Association on behalf of Respondents: | Mastagni Holstedt, David P. Mastagni, Gary G. Gomez |
| Counsel for Amicus Curiae California Workers' Compensation Institute & Property and Casualty Insurers Association of America on behalf of Respondents: | Law Offices of Allweiss & McMurtry, Michael A. Marks |