Filed 8/23/18

# IN THE SUPREME COURT OF CALIFORNIA

KIRK KING et al.,

      Plaintiffs and Appellants,

      v.

COMPPARTNERS, INC., et al.,

      Defendants and Respondents.

S232197

Ct.App. 4/2 E063527

Riverside County
Super. Ct. No. RIC 1409797

By statute, California's workers' compensation system provides an injured employee's "exclusive" remedy against an employer for compensable work-related injuries. (Lab. Code, § 3602, subd. (a).) Here we consider the application of workers' compensation exclusivity to claims arising from the workers' compensation utilization review process. Through that process, utilization reviewers, acting on behalf of employers, determine whether the plan recommended for the treatment of an employee's industrial injury is medically necessary after consulting a schedule of uniform treatment guidelines. If the utilization reviewer concludes that a recommended treatment is not medically necessary, he or she may modify or deny the treatment request. (Lab. Code, § 4610.)

In this case, a utilization reviewer denied a treating physician's request to continue prescribing certain medication for an injured employee. Alleging that the utilization reviewer caused him additional injuries by denying the request without

1

SEE CONCURRING OPINIONS

authorizing a weaning regimen or warning him of the possible side effects of abruptly ceasing the medication, the employee filed a lawsuit seeking recovery in tort. We conclude that the workers' compensation law provides the exclusive remedy for the employee's injuries and thus preempts the employee's tort claims.

## I.

## A.

First created more than a century ago, California's workers' compensation system is now governed by the Workers' Compensation Act (WCA), "a comprehensive statutory scheme governing compensation given to California employees for injuries incurred in the course and scope of their employment." (*Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 810 (*Vacanti*); see *Mathews v. Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 719, 729−731; Lab. Code, §§ 3200 et seq.) At the core of the WCA is what we have called the " ' "compensation bargain." ' " (*Vacanti*, *supra*, at p. 811.) Under this bargain, " 'the employer assumes liability for industrial personal injury or death without regard to fault in exchange for limitations on the amount of that liability.' " (*Ibid.*) The employee, for his or her part, " 'is afforded relatively swift and certain payment of benefits to cure or relieve the effects of industrial injury without having to prove fault but, in exchange, gives up the wider range of damages potentially available in tort.' " (*Ibid.*)

Under the WCA, an employer must provide an injured worker with all medical treatment reasonably required to cure or relieve the effects of his or her injury. (Lab. Code, § 4600.) When an injured employee suffers an industrial injury, the employee reports the injury to his or her employer and then seeks medical care from a treating physician. After examining the worker, "the treating physician recommends any medical treatment he or she believes is necessary and

2

the employer is given a treatment request to approve or deny." (*State Comp. Ins. Fund v. Workers' Comp. Appeals Bd.* (2008) 44 Cal.4th 230, 238 (*State Fund*).)

For many years, if an employer wished to challenge a treating physician's recommendation, it had to invoke a "cumbersome, lengthy, and potentially costly" dispute resolution process involving review by qualified medical evaluators, litigation before a workers' compensation judge, and a right of appeal to the Workers' Compensation Appeals Board. (*State Fund*, *supra*, 44 Cal.4th at p. 238; see *id*. at p. 239.) To increase efficiency and reduce costs, the Legislature enacted several major reforms that took effect in 2004. These reforms included a process of mandatory utilization review, under which a reviewer assesses a treating physician's recommendation according to a schedule that establishes uniform guidelines for evaluating treatment requests. (Lab. Code, § 4610; see *State Fund*, at p. 240; see also *Smith v. Workers' Comp. Appeals Bd.* (2009) 46 Cal.4th 272, 279.)[1]

Under the statute as amended, every employer is required to establish a utilization review process, "either directly or through its insurer or an entity with which an employer or insurer contracts for these services." (Lab. Code, § 4610, former subd. (b), now subd. (g).) The utilization review process is "comprehensive," covering "*any and all*" treatment requests. (*State Fund*, *supra*, 44 Cal.4th at pp. 236, 243.) "If the treatment request is straightforward and

---

[1]     Section 4610 was added to the Labor Code effective January 1, 2004. (Stats. 2003, ch. 639, § 28.) The Legislature later amended the section effective January 1, 2013. (Stats. 2012, ch. 363, § 43.) This is the version of section 4610 that was in effect at the time of the events at issue in this case.

The Legislature has since made additional amendments to section 4610, effective January 1, 2017 (Stats. 2016, ch. 868, § 3; Stats. 2016, ch. 885, § 1.5), and January 1, 2018 (Stats. 2017, ch. 240, § 1). Neither amendment affects our analysis in this case. Unless otherwise specified, we refer to the version of section 4610 that was in effect in 2013.

uncontroversial, the employer can quickly approve the request—utilization review is completed without any need for additional medical review of the request." (*Id.* at p. 241; see *id.* at p. 240.) But while an employer can unilaterally approve a treatment request, only a licensed physician competent to evaluate the "specific clinical issues" can modify, delay, or deny a treatment request. (Lab. Code, § 4610, former subd. (e), now subd. (g)(3)(A).) The central issue for the utilization reviewer is whether the requested treatment is medically necessary. (*Id.*, § 4610, subd. (a).) This medical necessity determination is to be made after consulting the schedule for medical treatment utilization (*id.*, § 4610, former subds. (c), (f), now subds. (g)(1), (h)), which is presumed to be "correct on the issue of extent and scope of medical treatment" (*id.*, § 4604.5, subd. (a); see *ibid.* [explaining that the presumption can be rebutted]).

Labor Code section 4610 specifies the information on which utilization reviewers are to rely in making medical necessity determinations (Lab. Code, § 4610, former subd. (d)), as well as the timing of the determinations (*id.*, § 4610, former subd. (g)) and the nature of the explanations that must accompany the determinations (*id.*, § 4610, former subd. (g)(4)). When, for example, a utilization reviewer decides to deny the recommendation of a treating physician in the midst of treatment, that determination must be communicated to the requesting physician within 24 hours of the decision. (*Id.*, § 4610, former subd. (g)(3)(A), now subd. (i)(4)(A).) In these so-called concurrent review cases, the statute provides that "medical care shall not be discontinued until the employee's physician has been notified of the decision and a care plan has been agreed upon by the physician that is appropriate for the medical needs of the employee." (*Id.*, § 4610, former subd. (g)(3)(B), now subd. (i)(4)(C).) The decision to deny the request must "include a clear and concise explanation of the reasons for the employer's decision, a description of the criteria or guidelines used, and the clinical reasons for the

4

decisions regarding medical necessity." (*Id.*, § 4610, former subd. (g)(4), now subd. (i)(5).)

About a decade after it first instituted mandatory utilization review, the Legislature enacted a second set of reforms designed to streamline the resolution of disputes concerning utilization review determinations. (Stats. 2012, ch. 363, § 1, pp. 3719−3720.) The Legislature found that the then-existing dispute resolution system was "costly, time consuming, and [did] not uniformly result in the provision of treatment that adhere[d] to the highest standards of evidence-based medicine," all of which "adversely affect[ed] the health and safety of workers injured in the course of employment." (*Id.*, § 1, subd. (d), p. 3719.) To remedy these ills, the Legislature crafted a system of "independent medical review," or "IMR," for resolving utilization review disputes. (Lab. Code, § 4610.5, subd. (d).)

Following this second set of amendments, the IMR process is the exclusive mechanism for review of a utilization review decision. (Lab. Code, § 4610.5, subd. (e); see also *id.*, § 4062, subd. (b) ["If the employee objects to a decision made pursuant to Section 4610 to modify, delay, or deny a request for authorization of a medical treatment recommendation made by a treating physician, the objection shall be resolved only in accordance with the independent medical review process established in Section 4610.5."].) Independent medical review "is performed by an independent review organization, which assigns medical professionals to review pertinent medical records, provider reports, and other information submitted to the organization or requested from the parties." (*Stevens v. Workers' Comp. Appeals Bd.* (2015) 241 Cal.App.4th 1074, 1090; see generally Lab. Code, § 4610.6.) The independent reviewer is tasked with determining whether the requested treatment is "medically necessary based on the specific medical needs of the employee and the standards of medical necessity as

5

defined in subdivision (c) of Section 4610.5." (*Id*., § 4610.6, subd. (c).) If an employee disputes an adverse decision on independent medical review, he or she may appeal that decision to the Workers' Compensation Appeals Board (*id.*, § 4610.6, subd. (h)); decisions of the Board may in turn be appealed to a Court of Appeal (*id.*, § 5950). (See *Stevens*, *supra*, 241 Cal.App.4th at p. 1091.)

**B.**

In February 2008, plaintiff Kirk King sustained a back injury while he was at work.[2] King suffered chronic pain as a result of the injury, which in turn caused him anxiety and depression. In July 2011, a mental health professional prescribed several psychotropic drugs, including Klonopin, to treat these latter conditions.

Defendant Dr. Naresh Sharma is an anesthesiologist who was employed by defendant CompPartners, Inc. (CompPartners), a licensed workers' compensation utilization review management company. In July 2013, Dr. Sharma conducted a utilization review of King's Klonopin prescription. Dr. Sharma determined that the Klonopin was medically unnecessary and decertified the prescription. Dr. Sharma's decertification did not provide for a weaning regimen, nor did Dr. Sharma warn King of the risks of abruptly ceasing Klonopin. King immediately stopped taking the medication and suffered a series of four seizures as a result.

---

[2] Because we are reviewing an order sustaining a general demurrer, we accept as true all the material allegations of the complaint. (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 7.) Plaintiffs' briefs include factual assertions that were not included in the complaint, and so we have not considered them in deciding whether the demurrer was properly sustained. (*United Bank & Trust Co. v. Fidelity & Deposit Co.* (1928) 204 Cal. 460, 461; *Harris v. King* (1998) 60 Cal.App.4th 1185, 1187.) We have, however, considered the new assertions in deciding, *post*, whether plaintiffs should have been granted leave to amend the complaint. (*Connerly v. State of California* (2014) 229 Cal.App.4th 457, 460.)

6

In September 2013, King sought a new prescription for Klonopin. A month later, Dr. Mohammed Ashraf Ali, a psychiatrist employed by CompPartners, performed a utilization review of the prescription. Dr. Ali, like Dr. Sharma, found that King's Klonopin prescription was medically unnecessary. And again, like Dr. Sharma, Dr. Ali neither authorized a weaning regimen nor warned King of the risks of abruptly stopping the medication.

In October 2014, King and his wife filed a complaint in superior court against CompPartners and Dr. Sharma, among others.[3] The Kings asserted claims of negligence, professional negligence, intentional and negligent infliction of emotional distress, and loss of consortium. Defendants demurred, arguing that the Kings' claims were preempted by the WCA. In the alternative, they argued that the negligence claims failed because Dr. Sharma owed no duty of care to King. The trial court agreed with both arguments and sustained the demurrer without leave to amend.

The Court of Appeal affirmed the order sustaining the demurrer but reversed the denial of leave to amend. The Court of Appeal agreed with defendants that the Kings' challenge to Dr. Sharma's decision to decertify the Klonopin prescription is subject to the exclusive remedies of the workers' compensation system. But insofar as the Kings instead challenge Dr. Sharma's failure to warn King of the risks of Klonopin withdrawal, the court concluded, the claim is not preempted because it does not directly challenge Dr. Sharma's medical necessity determination. Finally, the Court of Appeal held that Dr. Sharma owed King a duty of care, though it also held that the scope of the duty could not be determined on the basis of the facts alleged in the Kings' complaint.

---

[3] The Kings also sued two other defendants, but only CompPartners and Dr. Sharma are parties to this appeal.

We granted review. "In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.) If the demurrer was sustained without leave to amend, we consider whether there is a "reasonable possibility" that the defect in the complaint could be cured by amendment. (*Hendy v. Losse* (1991) 54 Cal.3d 723, 742 (*Hendy*).) The burden is on plaintiffs to prove that amendment could cure the defect. (*Ibid.*)

## II.

To give effect to the compensation bargain underlying the system, the WCA generally limits an employee's remedies against an employer for work-related injuries to those remedies provided by the statute itself. Labor Code section 3600, subdivision (a) provides that workers' compensation liability "shall, without regard to negligence, exist against an employer for any injury sustained by his or her employees arising out of and in the course of the employment . . . in those cases where the . . . conditions of compensation concur."[4] Subject to certain enumerated exceptions not relevant here, this liability is "in lieu of any other liability whatsoever." (Lab. Code, § 3600, subd. (a).) Labor Code section 3602 underscores the point: "Where the conditions of compensation . . . concur, the right to recover such compensation is . . . *the sole and exclusive remedy* of the employee . . . against the employer . . . ." (*Id.*, § 3602, subd. (a), italics added.)

---

**4**     The conditions of compensation relevant to this case are as follows: "(1) Where, at the time of the injury, both the employer and employee are subject to the compensation provisions of this division. [¶] (2) Where, at the time of the injury, the employee is performing service growing out of and incidental to his or her employment and is acting within the course of his or her employment. [¶] (3) Where the injury is proximately caused by the employment, either with or without negligence." (Lab. Code, § 3600, subd. (a).)

8

The WCA instructs that its provisions are to be "liberally construed by the courts with the purpose of extending their benefits for the protection of persons injured in the course of their employment." (Lab. Code, § 3202.) This rule of liberal construction applies even though a particular plaintiff might prefer to forgo a workers' compensation remedy in favor of a remedy at law: We construe the Act " 'in favor of awarding work[ers'] compensation, not in permitting civil litigation.' " (*Arriaga v. County of Alameda* (1995) 9 Cal.4th 1055, 1065, italics omitted.)

In addressing the application of the WCA's exclusivity provisions in this case, we confront two main issues: First, are the injuries the Kings allege in this case the sort of injuries that are covered by the workers' compensation exclusive remedy? And second, are the defendants in this case entitled to the protections of workers' compensation exclusivity? We address each issue in turn.

**A.**

It is by now well established that the WCA's exclusivity provisions preempt not only those causes of action premised on a compensable workplace injury, but also those causes of action premised on injuries " 'collateral to or derivative of' " such an injury. (*Vacanti*, *supra*, 24 Cal.4th at p. 811, quoting *Snyder v. Michael's Stores, Inc.* (1997) 16 Cal.4th 991, 997 (*Snyder*).) Such collateral or derivative injuries include injuries stemming from conduct occurring in the workers' compensation claims process. In *Vacanti*, for example, we held that the exclusivity provisions applied to claims brought by medical providers against workers' compensation insurers for the alleged mishandling of lien claims. Because the medical providers sought to recover compensation for medical services provided to workers injured in the course of their employment, we reasoned, their claims fell within the scope of workers' compensation exclusivity. And to the extent the acts alleged by the providers constituted a " 'normal part of

9

the employment relationship' [citation] or the workers' compensation claims process," the claims were barred. (*Id.* at p. 820.) "[I]njuries arising out of and in the course of the workers' compensation claims process," we explained, "fall within the scope of the exclusive remedy provisions because th[e] process is tethered to a compensable injury." (*Id.* at p. 815.)

This conclusion follows from the unique causation principles underlying Labor Code section 3600. As we recently explained in *South Coast Framing, Inc. v. Workers' Comp. Appeals Bd.* (2015) 61 Cal.4th 291, 297 (*South Coast Framing*), section 3600 provides a workers' compensation remedy for an injury linked " ' "in some causal fashion" ' " to employment. This causation requirement differs markedly from ordinary tort principles, in that " ' " '[a]ll that is required is that the employment be one of the contributing causes without which the injury would not have occurred.' " [Citation.]' " (*Id.* at pp. 297−298.) Because of this, "industrial causation has been shown in an array of scenarios where a work injury contributes to a subsequent nonindustrial injury." (*Id.* at p. 300.) California courts have held, for example, that "[a]n employee is entitled to compensation if a new or aggravated injury results from medical or surgical treatment for an industrial injury." (*Ibid.* [citing cases]; see *id.* at p. 294 [workers' compensation remedy available to family of worker who died from the combination of drugs prescribed following a fall at work].) This is true regardless of " 'whether the treatment [was] provided by a physician selected by the employee or by the employer or the employer's compensation carrier.' " (*Id.* at p. 306.) And where the remedy is available as an element of the compensation bargain it is exclusive of any other remedy to which the worker might otherwise be entitled from the employer: "The employer's compensation obligation is 'in lieu of any other liability whatsoever to any person.' " (*Snyder*, *supra*, 16 Cal.4th at p. 996, quoting Lab. Code, § 3600, italics omitted.)

10

These established principles lead to a straightforward answer here. The Kings seek to recover for injuries that arose during the treatment of King's industrial injury and in the course of the workers' compensation claims process. Because the Kings allege injuries that are derivative of a compensable workplace injury, their claims fall within the scope of the workers' compensation bargain and are therefore compensable within the workers' compensation system.

The Court of Appeal agreed with this conclusion insofar as the Kings are proceeding against defendants on a theory that Dr. Sharma made an erroneous medical necessity determination regarding King's Klonopin prescription. But the court concluded that the exclusivity provisions of the WCA do not apply to the extent the Kings complain of Dr. Sharma's failure to warn King of the adverse consequences of abruptly stopping Klonopin. This was error; focusing on Dr. Sharma's failure to warn does not alter the analysis. On either theory of liability, King's injury arose out of and in the course of utilization review—a statutorily required part of the workers' compensation claims process, to which he would not have been subject had he not suffered a work-related back injury. The injury is thus compensable under the WCA.

In reaching its contrary conclusion regarding the Kings' failure-to-warn theory, the Court of Appeal relied on *Vacanti*'s observation that "courts have allowed tort claims in cases where the alleged injury—the aggravation of an existing workplace injury—did not occur in the course of an employment relationship. (See, e.g., *Weinstein v. St. Mary's Medical Center* (1997) 58 Cal.App.4th 1223, 1235−1236 [allowing a medical malpractice claim against the employer because the resulting aggravation of the workplace injury did not arise out of the employment relationship].)" (*Vacanti*, *supra*, 24 Cal.4th at p. 814.) The Court of Appeal read this passage to mean that "if something goes wrong in the claims process for [a] workplace injury," then the WCA's exclusivity provisions

11

apply, but "if a new injury arises or [a] prior workplace injury is aggravated, . . . the exclusivity provisions do not necessarily apply." (*King v. CompPartners, Inc.* (2016) 243 Cal.App.4th 685, 694.)  This is not a fair reading of the passage. *Vacanti* did not attempt to draw a distinction between claims that "something [went] wrong in the claims process," on the one hand, and claims of a new or aggravated injury, on the other.  *Vacanti* instead simply noted that cases have held that the WCA does not preempt claims of new or aggravated injuries arising outside "*the employment relationship*." (*Vacanti*, *supra*, at p. 814, italics added.)

   *Vacanti*'s reference to *Weinstein v. St. Mary's Medical Center* offers some insight into what this court had in mind.  The plaintiff in *Weinstein* was a hospital employee who was injured on the job.  She voluntarily sought treatment for her workplace injury at the hospital where she worked.  While on the premises to receive treatment, she was injured in a slip and fall.  (*Weinstein v. St. Mary's Medical Center*, *supra*, 58 Cal.App.4th at p. 1226 (*Weinstein*).)  The hospital argued that tort remedies for the slip and fall injury were barred by workers' compensation exclusivity.  The Court of Appeal rejected the argument, invoking the so-called "dual capacity doctrine" first enunciated by this court in *Duprey v. Shane* (1952) 39 Cal.2d 781 (*Duprey*).  That doctrine, as we have later described it, "posits that an employer may have or assume a relationship with an employee other than that of employer-employee, and that when an employee seeks damages for injuries arising out of the secondary relationship the employee's claim is not subject to the exclusive remedy provisions of the Workers' Compensation Act" (*Hendy*, *supra*, 54 Cal.3d at p. 730).  The court in *Weinstein* reasoned that the plaintiff's slip and fall injury was entirely independent of her employment relationship with the hospital; she had freely chosen to receive treatment at the

12

hospital, and her claims invoked the hospital's duty toward her in its capacity as a landowner, not as an employer. (*Weinstein*, at pp. 1235−1236.)[5]

This case presents no comparable circumstances. Certainly King, like the plaintiff in *Weinstein*, seeks recovery for injuries following his initial industrial injury. But unlike the injuries at issue in *Weinstein*, King's injuries occurred within the scope of the employment relationship: King alleges the injuries resulted from errors in the utilization review process—a process that King's employer, in its capacity as an employer, was required to establish for the review of the treatment recommended for King's prior industrial injury. (See Lab. Code, § 4610.)

The Court of Appeal at least implicitly recognized the relationship between King's alleged injuries and his employment when it concluded that the Kings' challenge to Dr. Sharma's medical necessity determination is preempted by the

---

[5] The court in *Weinstein* acknowledged that the Legislature had amended the WCA in 1982 to make clear that "[t]he fact that either the employee or the employer also occupied another or dual capacity prior to, or at the time of, the employee's industrial injury shall not permit the employee or his or her dependents to bring an action at law for damages against the employer." (Lab. Code, § 3602, subd. (a).) But the court concluded that the 1982 amendment did not alter the analysis because the plaintiff was seeking compensation for a slip and fall injury that occurred after the initial industrial injury and had no connection at all with any employment-related duties or obligations she might have toward the hospital, or the hospital toward her. (*Weinstein*, *supra*, 58 Cal.App.4th at p. 1237.) In other words, at the time of the injury in question, the hospital was acting in only one capacity, and that capacity was one of landowner, not employer.

This court has never had occasion to consider what, if anything, remains of the *Duprey* dual capacity doctrine following the 1982 amendment. (See *Hendy*, *supra*, 54 Cal.3d at pp. 735−739 [recognizing that the Legislature restricted the scope of the dual capacity doctrine when it amended section 3602 in 1982]; *id.* at p. 736, fn. 10 [reserving the question whether "the 1982 amendment of section 3602 abolished the dual capacity doctrine insofar as it applied to employer physicians who provide treatment to their employees for industrial injuries"].) The question is not raised here and we express no view on it.

13

WCA. But the court distinguished the Kings' failure-to-warn theory on the ground that such a warning, if given, would fall outside the scope of the workers' compensation claims process. That distinction is untenable. The utilization review provisions of the WCA govern not only the substance of a utilization review decision, whether based on medical necessity or otherwise, but also the content of the responses communicating the decision. (See Lab. Code, § 4610, former subd. (g)(4), now subd. (i)(5) ["Responses regarding decisions to modify, delay, or deny medical treatment services requested by physicians shall include a clear and concise explanation of the reasons for the employer's decision, a description of the criteria or guidelines used, and the clinical reasons for the decisions regarding medical necessity."].) The statute also specifies when, and to whom, the decision must be conveyed. (*Id.*, § 4610, former subd. (g)(3), now subd. (i)(4) [decisions "shall be communicated to the requesting physician within 24 hours of the decision"].) Both Dr. Sharma's decision to decertify Klonopin and the manner in which Dr. Sharma communicated that decision fall within the scope of the statutory process set up by King's employer to review recommendations concerning the treatment of King's industrial injury. The harm the Kings allege is therefore collateral to and derivative of that industrial injury and arose within the scope of King's employment for purposes of the workers' compensation exclusive remedy. (See *South Coast Framing*, *supra*, 61 Cal.4th at pp. 299−300.)

## B.

The Kings argue that even if their injuries were collateral to and derivative of King's work-related back injury, defendants are not entitled to the protections of workers' compensation exclusivity because defendants are not King's "employer" for purposes of the WCA's exclusivity provisions.

While the workers' compensation remedy bars suit against an "employer" (Lab. Code, §§ 3600, 3602), the statute expressly preserves the right of employees

14

to sue third parties: "The claim of an employee . . . for compensation does not affect his or her claim or right of action for all damages proximately resulting from the injury or death against any person other than the employer" (*id*., § 3852). The statute generally defines the term "employer" to mean, as relevant here, any "person including any public service corporation, which has any natural person in service" (*id*., § 3300, subd. (c); see also *id*., § 3351 [defining "employee" as "every person in the service of an employer"])—a definition that would appear to exclude CompPartners and Dr. Sharma, neither of whom can be said to have King "in [] service."

But as the Kings acknowledge, it has long been held that workers' compensation exclusivity preempts tort claims against certain other persons and entities as well: insurers, as "the '*alter ego*' of the employer" (see *Unruh v. Truck Insurance Exchange* (1972) 7 Cal.3d 616, 625 (*Unruh*)) and independent claims administrators and adjusters hired by self-insured employers to handle workers' compensation claims (*Marsh & McLennan, Inc. v. Superior Court* (1989) 49 Cal.3d 1, 4 (*Marsh*)). The question is whether the WCA, properly interpreted, also preempts tort claims against utilization reviewers hired by employers to carry out their statutory claims processing functions. Viewing the question against the backdrop of our precedents, we conclude the answer is yes.

In *Unruh*, an injured employee sued her employer's insurer and others in tort, alleging that they negligently and intentionally caused her physical and psychological injury while investigating her workers' compensation claim. (*Unruh*, *supra*, 7 Cal.3d at pp. 620−621.) We held that the WCA barred the employee from bringing her negligence claim against the insurer.**6** (*Id.* at p. 624.)

---

**6** We held under a narrow exception, not relevant here, that the employees' *intentional* tort claims against the insurer could proceed. (*Unruh*, *supra*, 7 Cal.3d at p. 630.) We discuss this exception below. (See part II.C., *post*.)

Although the statute's general definition of employer does not include insurers, a special provision defining "employer" for purposes of the WCA's subrogation provisions does expressly include insurers. (*Ibid.*, citing Lab. Code, § 3850.) We concluded that this special definition applied to the provision authorizing suits against any " 'person *other* than the employer.' " (*Unruh*, at p. 625, quoting Lab. Code, § 3852.) Therefore, we held, when an insurer "act[s] within its proper role in the compensation scheme" (*Unruh*, at p. 627), it "retain[s] immunity from lawsuit as the '*alter ego*' of the employer" (*id.* at p. 625).

In *Marsh*, an injured employee's surviving spouse sued the employer's independent claims administrator in tort for wrongly stopping the payment of the death benefits to which she was entitled. The plaintiff in that case argued that she was entitled to maintain the suit because the independent claims administrator was neither an employer, nor an insurer as in *Unruh*, and therefore was not entitled to the protections of workers' compensation exclusivity. We rejected the argument. The exclusive remedy doctrine, we explained, derives its force from more than the special statutory definition of "employer" on which we focused in *Unruh*. The exclusivity doctrine also derives from other provisions of the WCA: namely, Labor Code section 5300, which establishes the exclusive jurisdiction of the Workers' Compensation Appeals Board over disputes concerning an employee's right to compensation or the liability of an employer, and Labor Code section 5814, which specifies the penalty for unreasonable delay or refusal of compensation. Taken together, we concluded, these provisions "imply that the workers' compensation system encompasses all disputes over coverage and payment, whether they result from actions taken by the employer, by the employer's insurance carrier or, . . . by an independent claims administrator hired by the employer to handle the worker's claim." (*Marsh*, *supra*, 49 Cal.3d at p. 8.) By way of explanation, we noted that independent claims administrators perform a

16

statutorily recognized function in the workers' compensation scheme. (*Id.* at p. 9; see *ibid.* ["Administrators must now obtain certification from the Director of Industrial Relations [citation] and are subject to fines or revocation of their certificates at any time for good cause [citation]. [Citation.] They must also file annual reports with the director. [Citation.]"].) They perform this function on behalf of employers who "lack[] the expertise to themselves handle the workers' compensation claims of their employees" (*id.* at p. 8), and they are likely to bear ultimate responsibility for any penalty owed because of their misconduct (*ibid.*). We therefore concluded that an independent claims administrator stands in the shoes of the employer for the purpose of the claims administration process, and thus is entitled to the same protection from tort claims based on an injury compensable within the workers' compensation system. Concluding otherwise, we said, "would vitiate the very purpose of the exclusive remedy provisions of the Act." (*Ibid.*, fn. omitted.)

Similar considerations apply in the context of disputes regarding utilization review. The WCA requires employers to engage the services of utilization reviewers and regulates utilization review activities in considerable detail. (See Lab. Code, § 4610, former subd. (b), now subd. (g).) The statute identifies the exclusive means by which an employee may dispute a utilization review decision: namely, independent medical review. (Lab. Code, § 4610.5, subd. (e) ["A utilization review decision may be reviewed or appealed only by independent medical review pursuant to this section."]; see also *id.*, § 4062, subd. (b) ["If the employee objects to a decision made pursuant to Section 4610 to modify, delay, or deny a request for authorization of a medical treatment recommendation made by a treating physician, the objection shall be resolved *only* in accordance with the independent medical review process established in Section 4610.5" (italics added).].) And the statute prescribes administrative penalties against any

17

employer, insurer, or other entity that fails to meet any of the pertinent statutory requirements. (*Id.*, § 4610, former subd. (i), now subd. (p).)[7]

Perhaps most importantly, in performing their statutory functions, utilization reviewers, much like independent claims administrators, effectively stand in the shoes of employers: they perform utilization review on behalf of employers, to discharge the employers' own responsibilities to their employees. Indeed, as the statute acknowledges, the utilization review function can be performed by the employer itself, as well as by the insurer or by an independent entity with which the employer or insurer contracts. (Lab. Code, § 4610, former subd. (b), now subd. (g).) The statute contains no suggestion that claims arising from the utilization review process should be treated differently depending on whether the employer conducts the review in-house or instead contracts with an independent utilization review organization. To the contrary, Labor Code section 4610.5—which sets out the procedures for resolving "[a]ny dispute over a utilization review decision" (*id.*, § 4610.5, subd. (a))—expressly defines the term "employer" for that purpose to include the "employer, the insurer of an insured employer, a claims administrator, or a *utilization review organization,* or other entity acting on behalf of any of them." (*Id.*, § 4610.5, subd. (c)(4), italics added.) This special definitional provision tends to reinforce the conclusion that the Legislature regards utilization review organizations, like claims administrators, as acting on behalf of the employers that contracted for their services.

We presume that the Legislature was aware of our decision in *Marsh* when it crafted the utilization review provisions in sections 4610 and 4610.5. (*Williams*

---

[7] Recent amendments to the act, effective January 1, 2018, call for additional regulation of utilization review. Section 4610, for example, now contains detailed requirements for the accreditation of utilization review processes performed by physicians. (Lab. Code, § 4610, subd. (g)(4).)

*v. Industrial Acc. Com.* (1966) 64 Cal.2d 618, 620.) And in this case, much as in *Marsh*, those provisions, viewed in the broader context and operation of the WCA, evince an intent "that the workers' compensation system encompass[] all disputes" concerning utilization review, "whether they result from actions taken by the employer, by the employer's insurance carrier or" by a utilization review organization hired to handle the review on the employer's behalf. (*Marsh*, *supra*, 49 Cal.3d at p. 8.) As a general matter, a contrary conclusion would also undermine the Legislature's apparent purpose in establishing the independent medical review process as the exclusive mechanism for review of the utilization review decisions of an employer, including a utilization review organization acting on the employer's behalf. (Lab. Code, § 4610.5, subd. (c)(4).) Thus, following the reasoning of *Marsh*, we hold that the exclusive remedy for the Kings' injuries lies within the workers' compensation system.

## C.

The Kings and their amici raise policy concerns about this conclusion. Utilization review has a significant impact on the medical care of injured workers. It follows, they argue, that utilization reviewers should be held accountable for their mistakes in the same way and to the same extent as treating physicians, who may be sued for their malpractice. (*Duprey*, *supra*, 39 Cal.2d at p. 792.)

The statute's treatment of utilization reviewers is, however, consistent with the basic tradeoff that underlies the workers' compensation system as a whole: The employee is afforded swift and certain payments for medical treatment without having to prove fault, but, in exchange, gives up his right to sue in tort for those injuries that result from risks encompassed by the employment relationship. (See *Fermino v. Fedco, Inc.* (1994) 7 Cal.4th 701, 708; *South Coast Framing*, *supra*, 61 Cal.4th at pp. 299−300.) And the treatment of utilization reviewers is also consistent with the Legislature's apparent aim in crafting the WCA's

19

utilization review provisions. Those provisions task utilization reviewers, operating on behalf of employers, with making judgments on a limited set of documents pursuant to defined criteria and subject to further review only through statutorily specified procedures. (See *Simmons v. State Dept. of Mental Health* (2005) 70 Cal.Comp.Cases 866, 874 [noting that a utilization reviewer, unlike a treating physician, "does not physically examine the applicant, does not obtain a full history of the injury or a full medical history, and might not review all pertinent medical records"].) To permit plaintiffs to bring tort suits against utilization reviewers, in the same manner as they might bring tort suits against treating physicians, would subject utilization reviewers to a second—and perhaps competing—set of obligations rooted in tort rather than statute. That result does not sit easily with the Legislature's overarching purpose of replacing a dispute resolution process that was " 'cumbersome, lengthy, and potentially costly' " (*State Fund*, *supra*, 44 Cal.4th at p. 245 (conc. opn. of Kennard, J.)) with one that instead "balances the dual interests of speed and accuracy" (*id*. at p. 241 (maj. opn.)).

The detailed scheme the Legislature enacted does contain several safeguards to protect employees from the sort of harm the Kings have alleged. As previously noted, decisions to modify or deny a treatment request must be performed by licensed physicians, who must make medical necessity determinations in keeping with a uniform schedule of medical treatment guidelines.[8] (Lab. Code, § 4610, former subds. (c), (e), (f), now subds. (g)(1), (g)(3)(A), (h).) As particularly relevant here, the statute provides that "medical

---

[8] The uniform treatment schedule incorporates "evidence-based, peer-reviewed, nationally recognized standards of care recommended by [the Commission on Health and Safety and Workers' Compensation]." (Lab. Code, § 5307.27, subd. (a).)

20

care shall not be discontinued until the employee's physician has been notified of the decision and a care plan has been agreed upon by the physician that is appropriate for the medical needs of the employee."  (Lab. Code, § 4610, former subd. (g)(3)(B), now (i)(4)(C).)  To the extent that a physician or a utilization review organization fails to abide by a statutorily required part of the utilization review process, the employer, insurer, or utilization review organization may be subject to administrative penalties.  (Lab. Code, § 4610, former subd. (i), now subd. (p).)  A physician who makes unsound professional judgments in this capacity is subject to professional discipline, which may include the loss of his or her license.  (See Bus. & Prof. Code, §§ 2221, 2234.)  And, of course, employers are ultimately responsible for paying benefits to workers who suffer injuries as a result of the utilization review process.

Moreover, as we have previously held, workers' compensation exclusivity does not bar tort remedies resulting from acts that "fall outside the risks encompassed within the compensation bargain."  (*Vacanti*, *supra*, 24 Cal.4th at p. 812.)  The Kings have not invoked that exception here, and it would not apply in any event; the exception applies when the conduct is "so extreme and outrageous that" the defendant "in effect stepped out of its role" as contemplated by the workers' compensation scheme.  (*Marsh*, *supra*, 49 Cal.3d at p. 6; see *Vacanti*, *supra*, 24 Cal.4th at pp. 822−823.)  Where, by contrast, "the acts are 'a "normal" part of the employment relationship' [citation], or workers' compensation claims process [citation], or where the motive behind these acts does not violate a 'fundamental policy of this state' [citation], then the cause of action is barred."  (*Vacanti*, *supra*, 24 Cal.4th at p. 812.)  Here, there is no question that Dr. Sharma's utilization review decision, the content of the decision, and his manner of communicating that decision fall within the scope of the statutory utilization review process.  (See Lab. Code, § 4610.)  The Kings have

21

alleged that Dr. Sharma was wrong to decertify Klonopin as he did, but an allegation of mistake alone is not sufficient to exempt a cause of action from preemption. (Cf. *Vacanti*, *supra*, 24 Cal.4th at p. 821 ["Because denying or objecting to claims for benefits is also a normal part of the claims process, misconduct stemming from the delay or 'discontinuance of payments . . . is properly addressed by the [Workers' Compensation Appeals Board].' "].) In other cases, however, a plaintiff may well argue that a utilization reviewer's conduct exceeds the bounds of its role and that workers' compensation exclusivity therefore should not apply.

It is undoubtedly true that the availability of additional remedies would increase utilization reviewers' incentives to perform their tasks with appropriate competence and care. But as we read the statute the Legislature enacted, the workers' compensation system provides the exclusive remedy for otherwise compensable injuries stemming from alleged mistakes in the utilization review process. Here the Kings' tort claims concerning Dr. Sharma's decertification of King's prescription are collateral to and derivative of a compensable injury and defendants performed a statutorily recognized utilization review function on behalf of King's employer. Because the acts alleged do not suggest that defendants stepped outside of the utilization review role contemplated by statute, the Kings' claims are preempted.[9]

The Kings have not shown that they could amend their complaint in a manner that would alter this conclusion. In their briefing, they do raise some new factual assertions about Dr. Sharma's erroneous handling of the treatment request.

---

[9] This conclusion applies to the Kings' claims of negligence, as well as the claim of intentional infliction of emotional distress (see *Cole v. Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 151) and the claim of loss of consortium (see *Snyder*, *supra*, 16 Cal.4th at p. 997).

22

Specifically, they assert that Dr. Sharma signed a draft decision that had been prepared by a nurse without reviewing King's medical records or contacting his prescribing doctor. They also assert that Dr. Sharma and CompPartners erroneously sent Dr. Sharma's decertification decision to King's general physician instead of King's prescribing physician. But neither of these asserted errors in the utilization review process falls outside the risks contemplated by the statutory scheme that the Legislature has enacted. Such allegations, if formally pleaded, would not affect our conclusion that the exclusive remedy for the Kings' alleged injuries lies in the workers' compensation system.

### III.

We affirm the Court of Appeal's judgment insofar as it affirmed the trial court's sustaining of the demurrer, but reverse its judgment insofar as it permitted the Kings to amend their complaint to bolster their claim that defendants are liable in tort for failure to warn. We remand the case to the Court of Appeal for further proceedings consistent with this opinion.

**KRUGER, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**GROVER, J.**\*

---

\* Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING OPINION BY LIU, J.**

Today we hold that Kirk and Sara King's tort claims are preempted by California's workers' compensation system. As enacted by the Legislature and as interpreted by our court, this system provides the exclusive remedy not only for workplace injuries but also for injuries " ' "collateral to or derivative of" ' " workplace injuries. (Maj. opn., *ante*, at p. 9, quoting *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 811.) Because "[t]he Kings seek to recover for injuries that arose during the treatment of [Kirk] King's industrial injury and in the course of the workers' compensation claims process[,] . . . their claims fall within the scope of . . . the workers' compensation system." (Maj. opn., *ante*, at p. 11; see *Vacanti*, at p. 815.) This is true even though the Kings are seeking damages against a third-party utilization review organization and its employees: The statutory provisions governing utilization review, when "viewed in the broader context and operation of the [Workers' Compensation Act], evince an intent 'that the workers' compensation system encompass[] all disputes' concerning utilization review, 'whether they result from actions taken by the employer, by the employer's insurance carrier or' by a utilization review organization hired to handle the review on the employer's behalf." (Maj. opn., *ante*, at p. 19, quoting *Marsh & McLennan, Inc. v. Superior Court* (1989) 49 Cal.3d 1, 8.)

1

But the undisputed facts in this case suggest that the workers' compensation system, and the utilization review process in particular, may not be working as the Legislature intended. As today's opinion notes, "[t]he detailed scheme the Legislature enacted . . . contain[s] several safeguards to protect employees from the sort of harm the Kings have alleged." (Maj. opn., *ante*, at p. 20.) For example, "decisions to modify or deny a treatment request must be performed by licensed physicians, who must make medical necessity determinations in keeping with a uniform schedule of medical treatment guidelines. [Citations.] As particularly relevant here, . . . 'medical care shall not be discontinued until the employee's physician has been notified of the decision and a care plan has been agreed upon by the physician that is appropriate for the medical needs of the employee.' [Citation.] To the extent that . . . a utilization review organization fails to abide by a statutorily required part of the utilization review process, the . . . organization may be subject to administrative penalties. [Citation.] A physician who makes unsound professional judgments in this capacity is subject to professional discipline, which may include the loss of his or her license. [Citations.] And . . . employers are ultimately responsible for paying [compensatory] benefits to workers who suffer injuries as a result of the utilization review process." (*Id.* at pp. 20–21, fn. omitted.)

The record in this case does not indicate whether defendants followed the relevant statutory and regulatory requirements in discontinuing Kirk King's prescription for Klonopin. But the seizures King suffered as a result of his abrupt withdrawal from the drug provide grounds for skepticism that "a care plan . . . appropriate for the medical needs of the employee" was established before his prescription was discontinued. (Lab. Code, § 4610, former subd. (g)(3)(B), now subd. (i)(4)(c).) And even if defendants fully complied with the relevant requirements, it is questionable whether those requirements are enough to

2

prevent similar injuries from occurring in the future. The "compensation bargain" that underlies the workers' compensation system may allow for some "mistakes in the utilization review process." (Maj. opn., *ante*, at pp. 8, 22.) But the balance that bargain strikes between employers' interests and workers' interests presumes that utilization review — which is conducted either by the worker's employer or by an entity "stand[ing] in the shoes of [the] employer[]" (*id.* at p. 18) — will be performed "with appropriate competence and care" (*id.* at p. 22). The limited record here raises doubts as to whether King's utilization review was handled properly. The Legislature may wish to examine whether the existing safeguards provide sufficient incentives for competent and careful utilization review.

**LIU, J.**

**I CONCUR:**
**CUÉLLAR, J.**

**CONCURRING OPINION BY CUÉLLAR, J.**

Employees protected by the Workers' Compensation Act (WCA; Lab. Code, § 3201 et seq.) sometimes allege that their harm arises not only from a work-related injury, but from the "utilization review process" affecting their access to medical treatment for that injury (*id.*, § 4610). What today's majority opinion holds is that when these workers seek a remedy for such harms, they must find it exclusively in the WCA. I understand why the majority opinion reaches this conclusion, particularly in light of our decisions in *Unruh v. Truck Insurance Exchange* (1972) 7 Cal.3d 616 (*Unruh*) and *Marsh & McLennan, Inc. v. Superior Court* (1989) 49 Cal.3d 1 (*Marsh*). I write separately to emphasize the importance of the common law remedies that ordinarily protect the public, and why courts must continue to proceed with caution when considering — as in this case — whether a statute abrogates tort causes of action that ordinarily serve to incentivize good behavior, compensate for injuries, and right moral wrongs.

The WCA is a "comprehensive statutory scheme" governing the compensation employers must pay employees for injuries suffered in the course and scope of their employment. (*Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 810.) At the heart of that scheme is a trade-off: an employer pays employees less than the full measure of tort compensation for the work-related harm, but the payment is certain and provided without regard to fault. (*Ibid.*) This trade-off governs the relationship between employers and

1

employees who sustain a work-related injury, but keeps tort law relevant to third parties who might exacerbate such an injury. (See Lab. Code, § 3852 ["The claim of an employee . . . for compensation does not affect his or her claim or right of action for all damages proximately resulting from the injury or death against any person other than the employer"].) So even as the WCA mediates the relationship of employers and employees, it explicitly carves out room for the continued viability of tort claims — and the application of common law principles — for harms involving third parties.

If it is true that this carve-out could in principle conceivably encompass the independent officials and organizations involved in utilization review, it is also true that we have previously held this third-party "exception" not to encompass insurers (see *Unruh*, *supra*, 7 Cal.3d at pp. 623-627) or independent claims administrators (see *Marsh*, *supra*, 49 Cal.3d at pp. 4-10). We have so held on the basis of explicit, and sometimes implicit, indications of the Legislature's purpose in the WCA. (See Lab. Code, §§ 3850 [defining employer to include insurers], 5300, subd. (a) [indicating that the Workers' Compensation Appeals Board is the exclusive forum for the "recovery of compensation, or concerning any right or liability arising out of or incidental thereto"].) The majority today extends the reasoning in these cases to cover independent utilization reviewers, when an employee's injuries arise from an incorrect medical necessity decision or the failure to warn a patient about the consequences of following such a decision. (Maj. opn., *ante*, at pp. 17-18.)

Yet this result may be far from obvious — not only because at least some of the statutory scheme likely could be reconciled with a different outcome, but also because of the presumption we normally apply against the implied repeal of the common law. Not surprisingly, the common law undergirds our jurisprudence. (See, e.g., *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, 818-821 (*Yellow Cab*)

2

[discussing the codification of the common law principle of contributory negligence in Civ. Code, § 1714].)  That our society's long history with the common law showcases not only its virtues but its limitations is no reason to ignore its distinctive attributes.  In different settings, the common law leverages societal experiences to shape incentives, and to develop concepts and categories of obligation, that offer lawyers and the public a framework for understanding the duties we owe each other.  (See, e.g., *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 25, quoting Post, *The Social Foundations of Privacy* (1989) 77 Cal. L.Rev. 957, 1008 [describing how the common law right to privacy evolved out of a " 'normative set of social practices that constitute a way of life' " and "psychological foundations emanating from personal needs to establish and maintain identity and self-esteem by controlling self-disclosure"]; Warren & Brandeis, *The Right to Privacy* (1890) 4 Harv. L.Rev. 193, 193 ["Political, social, and economic changes entail the recognition of new rights, and the common law, in its eternal youth, grows to meet the demands of society"].)  As society and our institutions change, so does the common law.  (See *Yellow Cab*, *supra*, 13 Cal.3d at pp. 821-823 [finding contributory negligence to have evolved to comparative negligence through a common law process].)

The Legislature's power to curb the scope of common law causes of action is not only beyond question — it's part of the process that adapts the fabric of the common law to a changing world.  But we consider a restriction on the public's access to longstanding common law protections sufficiently fraught to expect a clear legislative statement attesting that such change occurred, and rightly so.  (See *McMillin Albany LLC v. Superior Court* (2018) 4 Cal.5th 241, 249 ["we construe statutory enactments as consonant with existing common law and reconcile the two bodies of law"]; *People v. Ah Sam* (1871) 41 Cal. 645, 653 [discussing how statutes are sometimes "intended to declare what the common law is, for the

3

purpose, merely, of making that certain which before was doubtful"]; Brown, *A Search for Clarity and Consistency in Judicial Process: The Maryland Court of Appeals Decides Whether to Change Common-Law Rules* (2003) 62 Md. L.Rev. 599, 603-604 ["requests to change the common law often produce acrimony. Someone is asserting that present conditions so differ from the past that an old, trusted rule must be discarded"].) So we apply a presumption against implied repeal of common law causes of action. (*California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 299.) Unless a statute "clearly and unequivocally" demonstrates a purpose different from a rule obtained from the common law (*Yellow Cab*, at p. 815), we make every attempt to find a rational means of harmonizing any conflicts between the two bodies of law (see *McMillin*, at p. 249 [requiring harmonization unless " 'the language or evident purpose of the statute' " requires the repeal of the common law rule]; cf. *Fuentes v. Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1, 7). The common law is neither substantively perfect nor perfectly efficient. Yet it makes sense to recognize its foundational status in our system, and to take seriously the doctrines and presumptions that allow us to make the most of what it has to offer.

The question here is why this presumption does not apply to independent utilization reviewers and the harms they potentially impose on employees like the plaintiff in this case. One answer may be that the presumption we apply against repeal of the common law can be easily rebutted in our analysis of the workers' compensation law — an area where the Legislature has explicitly eliminated the right to bring a tort suit against employers. (See Lab. Code, § 3600, subd. (a).) Given this explicit repudiation of tort law in the WCA, the question changes from whether the common law has been abrogated — it has — to the boundary lines of where it's been eliminated. The dividing line is many times decided on whether we consider a party an "employer" or an alter-ego thereof. This question must be

4

evaluated in the context of the workers' compensation scheme as a whole through explicit or implicit legislative indications of purpose. Although the presumption against implied repeals may still exist to rebuff undue expansions of who is an "employer," the weight of the WCA's explicit repudiation of tort law in combination with other indicators of legislative purpose may serve to rebut the presumption in cases like this one.

Remedies can play a particularly important role as an indicator of legislative purpose when courts seek to demarcate the precise distinction between who counts as employers and non-employers under the WCA scheme. A maxim of the common law is that every right has a remedy. (See *Marbury v. Madison* (1803) 5 U.S. 137, 163.) That maxim imbues our understanding of statutory rights as well. (*Collins v. O'Laverty* (1902) 136 Cal. 31, 35 ["To deny the remedy would be to deny the right . . . , and thus to nullify the statute"].) Without an explicit legislative directive, it would run against this maxim, and the presumption against the implied repeal of the common law, to eliminate any remedy for what would normally be redressed through a tort cause of action. We, of course, do not reach the question whether a tort duty of care runs between the independent utilization reviewer and the employee. But that is in no small part because the Legislature implemented a number of safeguards against, and administrative penalties for, what occurred here, as well as a remedy in the form of additional workers' compensation for the injuries incurred. As the majority points out, when the arcana of utilization review results in denial, the process must be performed by licensed physicians (Lab. Code, § 4610, former subd. (e), now subd. (g)(3)(A)), those decisions must comply with uniform medical treatment guidelines (*id.*, § 4610, former subds. (c) & (f), now subds. (g)(1) & (h)), and an adverse decision cannot result in the cessation of care until the employee's physician receives notification of the decision and agrees to a care plan for the employee (*id.*, § 4610,

5

former subd. (g)(3)(B), now subd. (i)(4)(C)).  (See maj. opn., *ante*, at pp. 20-21.)  And if a utilization reviewer "fail[s] to meet any . . . requirement of this section," the Division of Workers' Compensation may "assess, by order, administrative penalties for each failure" on the utilization review organization.  (Lab. Code, § 4610, former subd. (i), now subd. (p).)  Moreover, the physician utilization reviewer may be subject to professional discipline that could result in the loss of his or her license or a public reprimand.  (See Bus. & Profs. Code, § 2221, 2221.05.)  And of course, as the majority opinion holds, the employee has a remedy in the form of workers' compensation benefits.  (See maj. opn., *ante*, at p. 14 [finding harm arising from the utilization reviewer's decision to fall "within the scope of King's employment for purposes of the workers' compensation exclusive remedy"]; see also *id.* at p. 21.)

Our understanding of the utilization review statute's purpose may have differed if the Legislature had failed to provide any such safeguards, incentives, or remedies.  Even now, those safeguards and remedies may not be set at optimal levels, and the Legislature may find it makes sense to change them.  (See conc. opn. of Liu, J., *ante*, at pp. 2-3.)  Nonetheless, they are sufficient to support our conclusion — in light of our decisions in *Marsh* and *Unruh*, and the WCA's scheme as a whole — that any presumption against the implied repeal of common law tort remedies otherwise available to protect people from negligent or botched utilization review procedures is rebutted in this case.

**CUÉLLAR, J.**

**I CONCUR:**

**GROVER, J.**[*]

_____
*      Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** King v. CompPartners, Inc.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 243 Cal.App.4th 685
**Rehearing Granted**

_____

**Opinion No.** S232197
**Date Filed:** August 23, 2018

_____

**Court:** Superior
**County:** Riverside
**Judge:** Sharon J. Waters

_____

**Counsel:**

Law Offices of Patricia A. Law, Patricia A. Law, Jonathan A. Falcioni; Arias & Lockwood and Christopher D. Lockwood for Plaintiffs and Appellants.

Smith & Baltaxe and Bernhard Baltaxe for California Applicants' Attorneys Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Francisco J. Silva, Long X. Do, Lisa Matsubara and Stacey B. Wittorff for California Medical Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Charles Edward Clark for California Society of Industrial Medicine and Surgery, Inc., as Amicus Curiae on behalf of Plaintiffs and Appellants.

Joshua S. Meltzer; Munger, Tolles & Olson, Fred A. Rowley, Jr., Jeffrey Y. Wu; Murchison & Cumming, William D. Naeve, Ellen M. Tipping, Terry L. Kesinger and David A. Winkle for Defendants and Respondents.

Law Offices of Alweiss & McMurtry and Michael A. Marks for California Workers' Compensation Institute and American Insurance Association as Amici Curiae on behalf of Defendants and Respondents.

Crowell & Moring, David D. Johnson; Lewis Brisbois Bisgaard & Smith and Raul L. Martinez for National Association of Independent Review Organizations, Coventry Health Care Workers Compensation, Inc., and ExamWorks, Inc., as Amici Curiae on behalf of Defendants and Respondents.

Mary C. Wickham, County Counsel (Los Angeles), Ralph L. Rosato, Assistant County Counsel, Derrick M. Au, Principal Deputy County Counsel, Susan T. Collins and Emily A Grospe, Deputy County Counsel, for County of Los Angeles as Amicus Curiae on behalf of Defendants and Respondents.

**Page 2 – S231197 – counsel continued**

**Counsel:**

Finnegan, Marks, Theofel & Desmond and Randall G. Poppy for California Chamber of Commerce, the National Council of Self-Insurers, Property Casualty Insurers Association of America doing business in California as Association of California Insurance Companies (PCI) and CAJPA as Amici Curiae on behalf of Defendants and Respondents.

Fred J. Hiestand for the Civil Justice Association of California as Amicus Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Patricia A. Law
Law Offices of Patricia A. Law
10837 Laurel Street, Suite 101
Rancho Cucamonga, CA  91730
(951) 683-8320

Christopher D. Lockwood
Arias & Lockwood
1881 South Business Center Drive, Suite 9A
San Bernardino, CA  92408
(909) 890-0125

Fred A. Rowley, Jr.
Munger, Tolles & Olson
350 South Grand Avenue, 50th Floor
Los Angeles, CA  90071-3426
(213) 683-9100