Filed 11/17/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| COVER RIGHT ROOFING, INC., <br><br> Cross-complainant and Appellant, <br><br> v. <br><br> STATE COMPENSATION INSURANCE FUND, <br><br> Cross-defendant and Appellant. | G060210 <br><br> (Super. Ct. No. 30-2019-01084230) <br><br> O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Martha K. Gooding, Judge. Affirmed.

Margie R. Lariviere, General Counsel, Anthony Lewis, Assistant General Counsel, Rhett R. Johnson, Assistant Chief Counsel, and Gary R. Soliman, Attorney for Cross-defendant and Appellant.

Sterling Scott Winchell and Sterling Scott Winchell for Cross-complainant and Appellant.

\* \* \*

This appeal asks us to interpret Insurance Code section 11664, subdivision (e)(6)(A),[1] which requires workers' compensation insurers to provide their insureds with notice of certain premium rate increases: "[i]f the premium rate in the governing classification for the insured is to be increased 25 percent or greater and the insurer intends to renew the policy, the insurer shall provide a written notice of a renewal offer not less than 30 days prior to the policy renewal date." (§ 11664, subd. (e)(6)(A).) In a matter of first impression, we find cross-defendant State Compensation Insurance Fund (State Fund) was not obligated to provide notice to cross-complainant Cover Right Roofing (Cover Right) under this statute. The increase at issue was not due to any change in the premium rate of Cover Right's governing classification. Rather, a third party changed the applicable governing classification criteria, which caused Cover Right to be assigned a new governing classification with a higher premium rate. The statute does not require notice in such circumstances. Thus, we find the trial court correctly granted State Fund's motion for summary judgment and affirm the judgment.

I

FACTS AND PROCEDURAL HISTORY

A. *State Fund's Premiums*

This appeal concerns a particular rate known as a "base rate," which State Fund uses to calculate premiums for its insureds. The material facts are undisputed.

State Fund is a quasi-governmental entity that provides workers' compensation insurance. (*Stevens v. Workers' Comp. Appeals Bd.* (2015) 241 Cal.App.4th 1074, 1088, fn. 11.) It was "created in 1914 as a public enterprise fund and [is] subject to the jurisdiction and control of the state Insurance Commissioner." (*Notrica v. State Compensation Ins. Fund* (1999) 70 Cal.App.4th 911, 918.) "State Fund 'is at

---

[1] All further undesignated statutory references are to the Insurance Code.

2

once both an agency of the state and an insurance carrier. In these two roles, it is self-operating and of a special and unique character.'" (*California Attorneys, etc. v. Brown* (2011) 195 Cal.App.4th 119, 124.)

State Fund calculates an estimated premium for its policies by multiplying the insured's estimated payroll by an interim billing rate and dividing the result by 100. The insured makes payments based on the estimated premium throughout the policy's life. Once the policy ends, State Fund calculates a final premium, and the insured is charged the difference between the estimated premium and the final premium. State Fund may perform an audit after the policy ends to determine the insured's final premium.

When calculating the estimated premium, the insured's interim billing rate is comprised of a base rate plus individual risk factors specific to the insured. Base rates are predetermined, generalized amounts that do not account for any individual risk variations or insured-specific factors. State Fund uses actuarial models to develop its base rates, which must be approved by the California Department of Insurance. State Fund assigns base rates to its insureds using industry classifications from the Uniform Statistical Rating Plan – 1995 (the USRP). The USRP industry classifications are established by the Workers' Compensation Insurance Rating Bureau (the Bureau) and are codified in the California Code of Regulations, title 10, section 2318.6.

USRP industry classifications are assigned by State Fund based on the insured's business operations. Typically, a single classification is assigned to each insured. But an exception to this rule occurs when the insured's assigned industry classification contains a dual wage classification. As its name suggests, a dual wage classification consists of two separate wage-based classifications that are both assigned to the insured. The only difference between the two classifications is whether the average wages of the insured's employees fall below or above a defined amount, known as the

3

dual wage threshold.[2] If the average wages are above the dual wage threshold, the insured is assigned one classification. If they are below it, the other classification is assigned. Significantly, each of these classifications has its own base rate. While the Bureau determines the dual wage threshold amount, State Fund sets the base rates for each classification. Base rates are expressed as rate per $100 of payroll, and they reflect an insurer's perceived risk for insuring an employer assigned to a given classification.

B. *Cover Right's Policy*

Cover Right is a roofing company. It held a workers' compensation insurance policy with State Fund in 2017, which covered January 1, 2017 to December 31, 2017 (the 2017 policy). State Fund assigned the 2017 policy a dual wage classification relating to roofing operations. The two classifications were (1) Class 5552-1 – Roofing – all kinds – including shop, yard or storage operations, which applied to roofers whose average hourly wages were *below* the dual wage threshold, and (2) Class 5553-1 – Roofing – all kinds – including shop, yard or storage operations, which applied to roofers whose average hourly wages *equaled or exceeded* the dual wage threshold. During the relevant period, the former had a higher base rate than the latter. The 2017 base rate for Class 5552-1 was $58.44 per $100 of payroll, while it was $31.18 per $100 of payroll for Class 5553-1. Thus, under Cover Right's dual wage classification, its base rate would be lower if it paid its workers at or above the dual wage threshold.

In 2017, the dual wage threshold set by the Bureau for Class 5552-1 and Class 5553-1 was $23 per hour. Cover Right employed six roofers in 2017. Two earned $23 an hour, three earned $24 an hour, and one earned $30 an hour. Because all of Cover Right's employees made equal or more than the dual wage threshold in 2017, State Fund assigned it the Class 5553-1 classification, and its final premium for the 2017 policy was

---

[2] It is unclear from the record how an insured's average wages are calculated.

calculated using the corresponding $31.18 base rate.[3] At some point in 2017, however, the Bureau increased the applicable dual wage threshold from $23 to $25 per hour, effective January 1, 2018, due to wage inflation over the years.

The 2017 policy automatically renewed after lapsing. The renewed policy with State Fund covered January 1, 2018 to December 31, 2018 (the 2018 policy). State Fund calculated the estimated premium for the 2018 policy under the assumption Cover Right would again be assigned the Class 5553-1 classification. In 2018, the base rate for Class 5553-1 was $26.92 per $100 of payroll, while the base rate for Class 5552-1 was $58.41 per $100 of payroll. Cover Right made $25,445.64 in estimated premium payments in 2018 that were primarily calculated using Class 5553-1's lower base rate.

State Fund performed an audit of the 2018 policy in early 2019. It found Cover Right had paid most of its employees $23 to $24 an hour in 2018, which was less than the new dual wage threshold of $25 an hour. Because Cover Right's average wages were under the dual wage threshold, State Fund assigned it the Class 5552-1 classification and calculated Cover Right's final premium using Class 5552-1's higher corresponding base rate. Under the Class 5552-1 classification, Cover Right owed a final premium of $56,766.72 for the 2018 policy.

In February 2019, State Fund sent Cover Right a bill for $31,321.08, the difference between what it had paid in estimated premiums for 2018 ($25,445.64) and the final premium calculated in the audit ($56,766.72). Cover Right maintains it did not know the dual wage threshold had changed until it received State Fund's bill.[4]

---

[3] Cover Right's opening brief claims it paid a total premium of $38,815 in 2017, but it provides no citation for this assertion.

[4] We note that on January 5, 2018, State Fund mailed a copy of 2018 policy to Cover Right's principal place of business. The 2018 policy included a policy endorsement showing the dual wage threshold for 2018 was $25 per hour.

Cover Right did not pay the bill, so State Fund assigned the debt to plaintiff Creditors Adjustment Bureau who filed suit to collect it. Cover Right then filed a cross-complaint against State Fund, asserting negligence and equitable indemnity claims based on an alleged violation of section 11664, subdivision (e)(6)(A). Specifically, Cover Right contended State Fund failed to provide notice that its base rate would increase from $31.18 per $100 of payroll in 2017 to $58.41 per $100 of payroll in 2018, an increase of over 87 percent. Cover Right alleged that if notice had been given, it would have either ensured all its employees were paid at least $25 an hour in 2018 (so it could be assigned the Class 5553-1 classification, which had a lower base rate) or it would have obtained a policy from another insurer.

State Fund demurred to the cross-complaint, claiming it had no legal duty of care to disclose any premium rate increases to its insureds. The court overruled the demurrer, reasoning that "[g]iven the mandatory language of section 11664[, subdivision (e)(6)(A),] and the purpose of the statute, [it could not] find, as a matter of law, that the statute does not establish a standard of care, specifically for workers compensation insurance policies, with respect to notification of premium rate hikes."

State Fund then moved for summary judgment on Cover Right's claims. It argued there was no violation of section 11664, subdivision (e)(6)(A), because it did not increase the respective base rates for either Class 5552-1 or Class 5553-1 by more than 25 percent. Rather, Cover Right's classification changed in 2018, which resulted in a higher corresponding base rate. State Fund asserted the statute does not require notice for such changes.

The trial court agreed with State Fund. It concluded section 11664, subdivision (e)(6)(A), unambiguously "does not require written notice where the defined threshold for the governing classification is changed." Rather, the statute only "requires written notice of a renewal offer when 'the *premium rate* in the governing classification for the insured is to be increased 25 percent or greater . . . .'" The court granted State

6

Fund's summary judgment motion and subsequently entered judgment in favor of State Fund on Cover Right's cross-complaint.

Cover Right now appeals, arguing the trial court erred in interpreting section 11664, subdivision (e)(6)(A). In response, State Fund filed a protective cross-appeal. If we overturn the court's summary judgment order on appeal, State Fund's cross-appeal requests that we review the court's order overruling its demurrer. We find the court properly granted State Fund's summary judgment motion. As such, there is no need to address State Fund's cross-appeal.

## II

## DISCUSSION

The parties agree this appeal turns on our interpretation of section 11664, subdivision (e)(6)(A). Questions of statutory interpretation are reviewed de novo. (*Imperial Merchant Services, Inc. v. Hunt* (2009) 47 Cal.4th 381, 387-388.) "Under settled canons of statutory construction, in construing a statute we ascertain the Legislature's intent in order to effectuate the law's purpose. [Citation.] We must look to the statute's words and give them 'their usual and ordinary meaning.' [Citation.] 'The statute's plain meaning controls the court's interpretation unless its words are ambiguous.'" (*Ibid*.) "'"When the language of a statute is clear, we need go no further."'" (*People v. Harrison* (2013) 57 Cal.4th 1211, 1221-1222.) But if the statutory language is ambiguous, "'courts may consider other aids, such as the statute's purpose, legislative history, and public policy.'" (*Imperial Merchant Services, Inc.*, at pp. 387-388.)

Under section 11664, subdivision (e)(6)(A), "[i]f the premium rate in the governing classification for the insured is to be increased 25 percent or greater and the insurer intends to renew the policy, the insurer shall provide a written notice of a renewal offer not less than 30 days prior to the policy renewal date." "'[P]remium rate' means

7

the cost of insurance per unit of exposure prior to the application of individual risk variations based on loss or expense considerations such as scheduled rating and experience rating." (§ 11664, subd. (e)(6)(B).) The parties agree, and it appears to be true under the statute, that the base rates at issue are premium rates for purposes of section 11664, subdivision (e)(6).[5]

Here, Cover Right asserts it was entitled to notice under section 11664, subdivision (e)(6)(A), because its premium rate increased from $31.18 per $100 of payroll in 2017 to $58.41 per $100 in 2018, due to the change in the dual wage threshold. We disagree. Notice is only required under the statute if "the premium rate *in the governing classification* for the insured is to be increased by 25 percent or greater." (§ 11664, subd. (e)(6)(A), italics added.) Under the statute's plain language, an insured is not entitled to notice simply because its base rate increases by 25 percent or more. The statute has a narrower application. As the italicized portion of the text indicates, notice is only required if the insurer increases a specific governing classification's base rate by at least 25 percent. In other words, State Fund would have been obligated to give Cover Right notice had it increased the base rate for either Class 5553-1 or Class 5552-1 by at least 25 percent from 2017 to 2018. It did not. It is undisputed the respective base rates for Class 5552-1 and 5553-1 both decreased from 2017 to 2018.

Cover Right's base rate increased by over 25 percent from 2017 to 2018 due to a change in Cover Right's *classification*, not due to an increase in the base rate of either Class 5552-1 or Class 5553-1. As set forth above, the Bureau changed the applicable dual wage threshold from $23 per hour in 2017 to $25 per hour in 2018. Cover Right paid most of its workers $23 to $24 per hour in 2017, so it was assigned the Class 5553-1 classification and its corresponding base rate for that year. Cover Right again paid most its workers $23 to $24 per hour in 2018. But because the Bureau had

---

[5] Throughout the remainder of this opinion, the term "premium rate" is used as defined under section 11664, subdivision (e)(6)(B).

changed the dual wage threshold for 2018, State Fund assigned Cover Right the Class 5552-1 classification. As such, Cover Right's final premium for 2018 was calculated using Class 5552-1's higher corresponding base rate. Under the text of the statute, notice is not required when an insured is assigned a new governing classification with a higher corresponding base rate. Rather, notice is only required when the "premium rate *in the governing classification*" increases. (§ 11664, subd. (e)(6)(A), italics added.) Finding State Fund was obligated to provide notice here would require us to ignore the italicized portion of the statute, which we cannot do. (See *Prang v. Los Angeles County Assessment Appeals Bd.* (2020) 58 Cal.App.5th 246, 254.)

We also find unreasonable Cover Right's interpretation of section 11664, subdivision (e)(6)(A). As discussed above, Cover Right was assigned a different base rate in 2018 due to a classification change, which occurred because Cover Right paid its workers an average wage of less than $25 an hour in 2018. If the statute applied, State Fund would have been required to provide Cover Right with notice of the increase near the end of 2017, specifically, at least 30 days before the policy renewed on January 1, 2018. (§ 11664, subdivision (e)(6)(A).) But in 2017, State Fund did not know the average wage Cover Right would pay its workers in 2018. It could only estimate what that average rate would be. Accordingly, prior to the effective date of the 2018 policy, State Fund could only speculate as to whether Cover Right would be assigned the Class 5552-1 or Class 5553-1 classification for 2018. Given the information it had, at best, State Fund could have provided Cover Right with notice of a *potential* change to its base rate for the 2018 policy. But the statute does not require notice of potential increases. It only requires notice if premium rate "*is to be increased* 25 percent or greater." (§ 11664, subd. (e)(6)(A), italics added.)

Cover Right argues State Fund had access to its payroll from prior years and knew the wages of its employees. It believes State Fund should have known in 2017 that Cover Right would pay its workers less than $25 an hour in 2018 and should have

anticipated this would cause Cover Right to be assigned Class 5552-1 in 2018 rather than Class 5553-1. This argument is unpersuasive. Employee wages can change from year to year based on an employer's needs, general labor demands, and/or overall market conditions, among other factors. Even with Cover Right's historical wages, State Fund would still have to speculate as to whether Cover Right would maintain those same wages in 2018 to have given notice under the statute. It is unreasonable to interpret the statute in a manner that compels an insurer to guess whether an insured's governing classification will change in a given year.

Since the text of the statute is clear, we need not perform any further analysis.[6] Nonetheless, we also find requiring State Fund to give notice here would be unreasonable as a matter of public policy. As discussed above, adopting Cover Right's interpretation would require State Fund – not to mention other workers' compensation insurers – to anticipate potential classification changes for its insureds every year. This would force State Fund to review any classification changes promulgated by the Bureau, review each of its insured's current classifications, determine whether any of the Bureau's changes could affect its insured's classifications, and then determine whether any of these potential classification changes might cause an insured to be assigned a new classification with a base rate at least 25 percent greater than its prior classification. This is far too onerous of a burden to put on workers' compensation insurers. Rather, from a matter of policy, it is more reasonable to have individual employers monitor the Bureau's changes to classification criteria and determine how such changes might affect their insurance rates.

---

[6] Since the plain meaning of the statute is clear, the legislative history of section 11664, subdivision (e)(6)(A), is immaterial to our analysis. As such, we deny State Fund's request for judicial notice.

10

Because we uphold the trial court's order granting State Fund summary judgment, we do not address State Fund's cross-appeal, which asked us to review the court's demurrer ruling only if we overturned the summary judgment order.

## III

## DISPOSITION

We sympathize with Cover Right's situation.  Given all the responsibilities facing small businesses, we do not fault Cover Right for missing the Bureau's increase of the dual wage threshold.  Cover Right likely would have avoided the higher base rate had it known of this change.  Nonetheless, as set forth above, section 11664, subdivision (e)(6)(A), does not require an insurer to provide notice in the circumstances at issue here. Further, as a matter of public policy, it would be unreasonable to compel insurers to monitor the Bureau's changes to the various industry classifications.  As such, the judgment is affirmed.  State Fund is entitled to its costs on this appeal.

MOORE, ACTING P. J.

WE CONCUR:

GOETHALS, J.

MOTOIKE, J.

11